## IN THE UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **POTOMAC HERITAGE TRAIL** | * | |
| **ASSOCIATION, INC.,** | * | |
| | * | |
| **805 North Croydon St.** | * | |
| **Sterling, Virginia 20164;** | * | No. _____ |
| | * | |
| **DAHLGREN RAILROAD HERITAGE** | * | **COMPLAINT FOR** |
| **TRAIL ASSOCIATION, INC.,** | * | **INJUNCTIVE AND** |
| | * | **DECLARATORY RELIEF** |
| **5000 Liberty Woods Lane** | * | |
| **Woodbridge, Virginia 22193;** | * | |
| | * | |
| **AND** | * | |
| | * | |
| **OXON HILL BICYCLE AND TRAIL CLUB,** | * | |
| **INC.,** | * | |
| | * | |
| **9217 Crescent Lane** | * | |
| **La Plata, Maryland 20646** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **UNITED STATES DEPARTMENT OF** | * | |
| **TRANSPORTATION** | * | |
| | * | |
| **1200 New Jersey Ave SE** | * | |
| **Washington, DC 20590** | * | |
| | * | |
| **Serve on:** | * | |
| **United States Attorney for the District of** | * | |
| **Maryland** | * | |
| **36 S. Charles Street 4th Fl.** | * | |
| **Baltimore, Maryland 21201;** | * | |
| | * | |
| **PETE BUTTIGIEG, Secretary, United** | * | |
| **States Department of Transportation** | * | |
| | * | |
| **1200 New Jersey Ave SE** | * | |
| **Washington, DC 20590** | * | |
| | * | |

1

**Serve on:**                                                    *
**United States Attorney for the District of**                  *
**Maryland**                                                    *
**36 S. Charles Street 4th Fl.**                                *
**Baltimore, Maryland 21201;**                                 *
                                                                *
**UNITED       STATES       FEDERAL**                          *
**HIGHWAY ADMINISTRATION**                                     *
                                                                *
**1200 New Jersey Ave SE**                                     *
**Washington, DC 20590**                                       *
                                                                *
**Serve on:**                                                   *
**United States Attorney for the District of**                 *
**Maryland**                                                   *
**36 S. Charles Street 4th Fl.**                               *
**Baltimore, Maryland 21201;**                                 *
                                                                *
**Mayela Sosa, Acting Executive Director**                     *
**for the United States Federal Highway**                      *
**Administration**                                             *
                                                                *
**1200 New Jersey Ave SE**                                     *
**Washington, DC 20590**                                       *
                                                                *
**Serve on:**                                                   *
**United States Attorney for the District of**                 *
**Maryland**                                                   *
**36 S. Charles Street 4th Fl.**                               *
**Baltimore, Maryland 21201;**                                 *
                                                                *
**MARYLAND       DEPARTMENT       OF**                         *
**TRANSPORTATION**                                             *
                                                                *
**7201 Corporate Center Drive**                                *
**Hanover, Maryland 21076**                                    *
                                                                *
**Serve on:**                                                   *
**Cheryl  A.  Brown-Whitfield,  Assistant**                    *
**Attorney General**                                           *
**St. Paul Plaza**                                             *
**200 St. Paul Place**                                         *
**Baltimore, Maryland 21202;**                                 *
                                                                *
**James F. Ports, Jr., current Chairman of**                   *
**the Board and Secretary of the Maryland**                    *

2

Department of Transportation, former    \*
Executive Director for the Maryland    \*
Transportation Authority    \*
    \*
7201 Corporate Center Drive    \*
Hanover, Maryland 21076    \*
    \*
Serve on:    \*
Cheryl A. Brown-Whitfield, Assistant    \*
Attorney General    \*
St. Paul Plaza    \*
200 St. Paul Place    \*
Baltimore, Maryland 21202;    \*
    \*
MARYLAND TRANSPORTATION    \*
AUTHORITY    \*
    \*
2310 Broening Highway    \*
Baltimore, Maryland 21224    \*
    \*
Serve on:    \*
Kimberly A. Millender, Assistant    \*
Attorney General    \*
St. Paul Plaza    \*
200 St. Paul Place    \*
Baltimore, Maryland 21202;    \*
    \*
William Pines, Executive Director for the    \*
Maryland Transportation Authority    \*
    \*
2310 Broening Highway    \*
Baltimore, Maryland 21224    \*
    \*
Serve on:    \*
Kimberly A. Millender, Assistant    \*
Attorney General    \*
St. Paul Plaza    \*
200 St. Paul Place    \*
Baltimore, Maryland 21202;    \*
    \*
          Defendants.    \*

# COMPLAINT

## INTRODUCTION

1.      The historic Governor Harry W. Nice Memorial Bridge/Senator Thomas "Mac" Middleton Bridge spans the Potomac River across US 301 between King George County, Virginia, and Charles County, Maryland. (the "**Historic Nice Bridge**"). The bridge was opened in 1940 and is the only of its kind in Maryland.  The bridge is also the only crossing of the lower Potomac River between Maryland and Virginia, and is sixty miles south of the Woodrow Wilson Bridge, which is the next nearest crossing.

2.      Defendants are federal and state governmental agencies or officials who desire to replace the Historic Nice Bridge with a new bridge (the "**Project**"), have nearly completed construction on the new bridge and have expressed an intention to demolish the Historic Nice Bridge imminently.

3.      Plaintiffs, Potomac Heritage Trail Association, Inc. ("**Potomac Heritage Trail**"), the Dahlgren Railroad Heritage Trail Association, Inc. ("**DHRT**"), and Oxon Hill Bicycle and Trail Club, Inc. ("**Oxon Hill**"), file this Complaint seeking declaratory and injunctive relief against the United States Department of Transportation ("**DOT**"), the Federal Highway Administration ("**FHWA**") and the Maryland Transportation Authority ("**MDTA**"), as well as their officers, to compel compliance by those agencies with the Section 4(f) of the Department of Transportation Act of 1966 ("**Section 4(f)**"), the National Environmental Policy Act ("**NEPA**"), the National Historic Preservation Act ("**NHPA**"), Section 6(f) of the Land and Water Conservation Fund Act of 1965 ("**Section 6(f)**") and Maryland Environmental Policy Act ("**MEPA**"), as well as the regulations, executive orders and guidance implementing those laws (hereinafter referred to collectively as the "**Environmental Review Laws**").

4

4.      Defendants violated the Environmental Review Laws by providing Plaintiffs and the public with a bait and switch.

5.      Defendants in 2012 promised to construct a bridge with a separated and protected 10-foot path for pedestrian and bicycle traffic on the bridge (the "**bike/ped path**") and described that decision as taken to mitigate environmental, park resource and historic impacts.  *See* 2012 Final Section 4(f) Evaluation (attached hereto as **Exhibit A**).

6.      Specifically, the Section 4(f) evaluation built on the Environmental Assessment and Finding of No Significant Impact ("**FONSI**") (prepared under NEPA) (attached hereto as **Exhibit B**), and chose to proceed with **Modified Alternative 7** among fifteen considered alternatives, which included the bike and pedestrian path, as well as substantial shoulder width.

7.      The bridge configuration under selected Modified Alternative 7 is depicted in Figure 1, below.



*Figure 1:   Typical Section of Preferred Alternate*

*October 2012*                                                                                                              3

8.      The Section 4(f) Evaluation emphasized that placing the two-way bike and pedestrian path on the bridge responded to community concerns and mitigated harm to human resources and Section 4(f) property.

9.      The two-way bike and pedestrian path also featured prominently as a basis for mitigating the historic impact of demolishing the Historic Nice Bridge, as reflected both in the

Section 4(f) Evaluation and FONSI, as well as the attached Memorandum of Agreement ("MOA") by and among Defendants and other governmental agencies.  Exhibit A, Appendix D at 5 (expressing assurances that bike/pedestrian path would connect to Section 4(f) resources).

10.     Irrespective of the chosen alternative, Defendant FHWA approved funding— including under TIFIA (defined below), as well as provided other approvals—after Defendant MDTA chose to build the bridge in a different configuration than was studied under Environmental Review Laws—without a bike/ped path and by reducing both outside shoulders from twelve feet to two feet.

11.     The "**As Built Bridge**" (as that term is used herein) is depicted below:



12. Studying and selecting one configuration yet building another violates the Environmental Review Laws, as well as the public trust—particularly where, as here, the bike/ped path was a focus of Defendants' 2012 selection of Modified Alternative 7.

13.     Section 4(f), Section 6(f), NEPA, and the NHPA were enacted, in part, in response to government agencies forcing highways through the heart of communities, while leaving behind no discernable benefits for the communities or amenities disrupted by that action.

14.     MEPA was enacted after NEPA to serve a similar purpose—specifically, to cause Maryland agencies to consider environmental and human impacts prior to using legislatively allocated money for a state project.

15.     Local communities, particularly those minority communities in Charles County, Maryland, among others, need the promised bike/ped path for recreational access to Section 4(f) and Section 6(f) resources in Virginia, as described in the Section 4(f) Evaluation and the MOA; the As Built Bridge denies this safe recreational access to such resources.

16.     The As Built Bridge is a material change that minimally requires re-assessment under Environmental Review Laws.

17.     Defendants never considered the As Built Bridge under Environmental Review Laws.

18.     Upon information and belief, Defendants intend to demolish imminently the Historic Nice Bridge, in part, through the use of explosives, and to use rubble from the bridge to form an underwater reef.

19.     Upon information and belief, Defendants never appropriately considered the environmental impact of demolishing the Historic Nice Bridge, including through the use of explosives or the impact of an asphalt/concrete underwater reef, when choosing in their 2012 FONSI and Section 4(f) Evaluation to address construction/demolition impacts at a later time— something that, upon information and belief, never appropriately occurred.  *See, e.g.*, FONSI at p. 19 (providing no specific demolition plan and indicating that coordination with National Marine Fisheries Service and a final Biological Assessment should be completed at a future time when construction/demolition techniques are determined).

20.     By pressing forward with the As Built Bridge and demolition of the Historic Nice Bridge, Defendants are violating both the letter and spirit of the Environmental Review Laws.

21.     Plaintiffs, therefore, seek declaratory judgment that Defendants have violated the Environmental Review Laws, as well as an injunction to stop demolition of the Historic Nice Bridge and to force the environmental reviews required by law.

22.     Plaintiffs further request that any re-assessment be conducted under present-day Environmental Review Law regulations, guidance and other standards, and that the court award attorney's fees.

23.     With this Complaint, Plaintiffs have moved under Rule 65 of the Federal Rules of Civil Procedure to stop the demolition of the Historic Nice Bridge while this action is pending.

## JURISDICTION AND VENUE

24.     Plaintiff seeks judicial review pursuant to Chapter 7 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and Section 305 of the NHPA, 54 U.S.C. § 307105.

25.     The court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1361 (original jurisdiction over mandamus action to compel agency performance of a duty).

26.     Venue is proper in the District of Maryland under 28 U.S.C. § 1391 (e) because a substantial part of the events or omissions giving rise to the claim occurred in Maryland, and the majority of the bridge is located in Maryland.

27.     The Court may grant declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201 and 2202.

28.     Defendants have taken final agency action and there exists an actual, justiciable controversy between Plaintiff and Defendants.

**PLAINTIFFS**

29.     The Potomac Heritage Trail Association, Inc., is a Virginia not for profit corporation and tax-exempt pursuant to Section 501(c)(3) of the Internal Revenue Code with a primary purpose of completing, maintaining, promoting and celebrating the Potomac Heritage National Scenic Trail on both sides of the Potomac River, in Virginia, Maryland and Washington DC, connecting existing trails and completing gaps where they exists, such as through the creation of a non-motorized recreational access/connection across the Potomac River.

30.     The Potomac Heritage Trail is adjacent to the bridge on both sides and its constituents and members stand to benefit directly from linking the Maryland and Virginia parts of the trail for bike, pedestrian, recreation and non-automobile travel purposes.

31.     The Dahlgren Railroad Heritage Trail Association, Inc.,[1] is a Virginia not for profit corporation with a primary purpose of protecting, promoting and improving the Dahlgren Road Heritage Trail ("**DRHT**"), as well as those who use it. The DRHT is part of the Potomac Heritage Trail.

32.     The 16-mile DRHT currently ends just short of is the bridge on the Virginia side, where the Commonwealth of Virginia is currently evaluating ways to complete this last gap, and its constituents stand to benefit directly from linking Maryland to the Virginia trail for bike, pedestrian, recreation, and non-automobile travel purposes.

---

[1] The 16-mile DHRT is privately owned by Ridgewood 2000 LLP.

33.     The DRHT and Potomac Heritage Trail are both expressly referenced as a resource considered for adverse impact in the MOA by and between the Defendants and other governmental authorities.  *See* Exhibit A, Appendix D at 33.

34.     The Oxon Hill Bicycle and Trail Club, Inc., is a Maryland not-for-profit corporation formed in 1972, with more than 400 members and a significant minority membership population, with a primary purpose of providing more and better bicycling, as a means of recreation and carbonless transportation, in Southern Maryland.

35.     Plaintiffs followed the EA and Section 4(f) public hearing processes, aware that from the very first document filed by MDTA, to the Final 4(f) Evaluation, MDTA itself advocated for the importance of a safe, barrier-separated bike/ped path-crossing in the Project. Indeed, MDTA's support for the lane stemmed from its similar support for a barrier-separated bike/ped path-trail on Woodrow Wilson bridge, the next bridge across the Potomac River approximately 60 miles upstream.

36.     Plaintiffs built their internal non-profit business plans around their legitimate expectation that the new bridge would connect their historic trails, as promised by Defendants.

37.     Plaintiffs are injured by the change to the Project that would prevent a safe Maryland-Virginia connection for bikes and pedestrians (and other micro-mobility and non-motorized transportation modes), including on Plaintiffs' respective historic trails.

38.     Plaintiffs will be irreparably harmed by demolition of the Historic Nice Bridge because the As Built bridge is nearly complete without the promised bike/ped path and the Historic Nice Bridge could be the last opportunity to ensure safe crossing and access to recreational resources at reasonable cost.  The Historic Nice Bridge is planned to be demolished imminently.

39.     Plaintiffs actively manage and raise money for the use, interconnection and protection of the trails that approach the bridge, and access to trails and recreational resources is severely impacted by Defendants' actions.

40.     Plaintiffs, their constituents/members and the users of these historic trails in Maryland and Virginia are directly impacted by Defendants' actions.

## DEFENDANTS

41.     Defendant, United States Department of Transportation ("DOT"), is the parent department of the Federal Highway Administration ("FHWA"), and, as such, bears overall responsibility for compliance with the laws that are the subject of this Complaint.

42.     Pete Buttigieg is sued in his official capacity as the Secretary of Transportation ("Secretary"). He is responsible for all Department of Transportation activities, including the activities of the FHWA.

43.     The FHWA is an agency operating within the DOT that approved funding for the Project and oversaw compliance with NEPA, Section 4(f), Section 6(f), the NHPA, and other federal statutes and regulations imposing substantive and procedural requirements generally wrapped into the NEPA and Section 4(f) Evaluation.

44.     Mayela Sosa is sued in her official capacity as acting executive director of the FHWA.

45.     The MDTA served as state and/or local lead agency for the Project, and, in that capacity, prepared documents and entered into agreements with DOT/FHWA to comply with NEPA, Section 4(f), Section 6(f) and the NHPA (and possibly MEPA), and assisted with various economic, construction and environmental records, including the Environmental Assessment

("**EA**") and Final Section 4(f) Evaluation.  The MDTA must follow federal environmental laws (including those laws wrapped into the NEPA and Section 4(f) Evaluation) and the MEPA.

46.     James F. Ports is sued in his official capacity as Chairman of MDTA, Secretary of the Maryland Department of Transportation and former Executive Director of MDTA during relevant times.

47.     William Pines is sued in his official capacity as Executive Director of MDTA.

48.     Collectively, DOT/FHWA and MDTA chose Modified Alternative 7, which was materially changed before construction without meaningful consideration under the Environmental Review Laws.

49.     Defendants, collectively, also have failed to assess the environmental impact of the method of demolition of the Historic Nice Bridge under applicable Environmental Review Laws, which includes the use of explosives and bridge rubble to create a reef.

**THE PROJECT**

50.     The purpose of the Project is to replace the Historic Nice Bridge with a new bridge meeting present-day demands.

51.     The bridge sits at a critical crossing point of the Potomac River between Southern Maryland and Virginia.

52.     Given the width of the Potomac River near this location, the bridge is extremely important to military, public safety, traffic and recreational users; the next nearest bridge is the Woodrow Wilson Bridge sixty miles to the north, which carries I-495 outside Washington DC.



53.     The Historic Nice Bridge was constructed between 1938 and 1940 and opened to traffic on December 15, 1940. Initially called the Potomac River Bridge, the Nice Bridge was renamed in April 1968 to honor Maryland Governor Harry W. Nice, whose administration oversaw planning and construction.  *Ex.* A at p. 14.  In October 2018, the name of retiring state Senator Thomas M. Middleton was added to the bridge, making it officially the Governor Harry W. Nice Memorial/Senator Thomas "Mac" Middleton Bridge.

54.     The 1.7 mile bridge carries US 301 across the Potomac River connecting Charles County, Maryland, and King George County, Virginia.  *Id.*

55.     The Historic Nice Bridge, which is owned by MDTA and scheduled for imminent demolition, is a steel cantilever bridge and is the only known example of this type of bridge architecture and design in Maryland.  *Id.*

56.     Very few significant alterations have occurred to the Historic Nice Bridge since construction; therefore, the bridge retains the integrity of all original components. The Historic

13

Nice Bridge is also associated with significant historical events because of its role in encouraging inter- and intrastate transportation and commerce. It was the first bridge to provide direct roadway access from Maryland into Virginia south of Washington, DC. Therefore, the Historic Nice Bridge is eligible for listing on the National Register of Historic Places ("**NRHP**") under Criterion A for its association with significant historical events and under Criterion C for its distinctive method of construction. *Id.*

57.     The land located north of US 301 adjacent to the Potomac River in Virginia includes Barnesfield Park, Dahlgren Wayside Park, and the Potomac Gateway Welcome Center. Each provides public park and recreational facilities and are Section 4(f) properties. *Id.* at 15. Barnesfield Park is also a Section 6(f) property.  Ex. A, Attachment D.

58.     The crossing-point provides access to residents of Southern Maryland to Northern Virginia, including access to the important Section 4(f)-designated parks near the Virginia shore of the Potomac.

59.     The Maryland crossing point is in Charles County, Maryland, which is majority (60%) non-white.[2]

60.     Barnesfield Park is a 146.5-acre public park located along the north side of US 301, just west of Roseland Road in King George County, Virginia. Access to the park from US 301 is provided via Barnesfield Road. Ex. A at 17.

61.     Dahlgren Wayside Park is a 14.7-acre public park located adjacent to the north side of US 301 along the Virginia bank of the Potomac River. Access to Dahlgren Wayside Park is provided from US 301 via Roseland Road.  *Id.*

---

[2] UNITED STATES CENSUS BUREAU, QUICK FACTS, CHARLES COUNTY, MARYLAND (2021), https://www.census.gov/quickfacts/fact/table/charlescountymaryland/POP060210.

62.     Dahlgren Wayside Park provides the public opportunities for recreational activities including fishing, canoeing/kayaking, sunbathing, and picnicking. The park includes a sand beach along the Potomac River (450 feet long by 60 feet wide), boat access for small watercraft, picnic tables, and a parking area. *Id.* at 18.

63.     Historic trails surround the bridge on both sides, and Plaintiffs see the bridge as comprehensively linking numerous trails in Virginia and Maryland for the bikes and pedestrians who use these important resources.

64.     The Potomac Heritage National Scenic Trail was established by the United States Congress in 1983 and from its inception Congress envisioned the trail as following the Potomac River on both sides (Virginia and Maryland) all the way to the Chesapeake Bay.

65.     Plaintiffs strive and continue to actively plan to bring this Congressional intent to fruition in a safe manner by connecting historic trails using the separated pedestrian and bike crossing of the Nice Bridge, as depicted below:



66.     Plaintiffs built their plans around Defendants' 2012 promises.

67.     The envisioned PHNST trail would avail itself of the existing DRHT in Virginia, which is depicted below:



68.     The DRHT is used as a recreational, health and transportation venue and connects Section 4(f) properties identified in Defendants' Section 4(f) Evaluation.

69.     It is an accepted and promoted practice in the United States and throughout the world that trails should be developed as an interconnected system of venues; not unlike the Interstate Highway System first proposed by President Eisenhower in the 1950s.

70.     Situated in King George County, Virginia, adjacent to the Potomac River and Maryland, the DRHT is officially part of the federal Potomac Heritage National Scenic Trail, and is a "National Recreational Trail in the National Trails System," as authorized by the National Trails System Act of 1968, and specifically designated by the Secretary of Interior in 2018.

71.     This Potomac River crossing is a vital southern connection between Virginia and Maryland for hikers, cyclists and non-motorized transportation users, including for the users of these historic trails.

## THE SECTION 4(F) EVALUATION AND DEFENDANT'S BASIS FOR CHOOSING MODIFIED ALTERNATIVE 7

72.     Defendants' Section 4(f) Evaluation considered fifteen alternatives, ultimately selecting Modified Alternative 7, which called for the construction of a new bridge, demolition of the Historic Nice Bridge and a ten-foot wide, separated pedestrian and bike path.

73.     Defendants justified the demolition of the Historic Nice Bridge in their Section 4(f) analysis by relying on the inclusion of the ten-foot pedestrian and bike path (Ex. A at p. 4) (emphasis added):

> **With the construction of a new four-lane bridge and two-way bike/ped path, there will no longer be a transportation need for the existing historic bridge. Therefore, Modified Alternate 7 includes removal of the existing bridge immediately following the opening of the new four-lane bridge to traffic.**

74.     The Section 4(f) analysis favored Modified Alternative 7 because it described pedestrian and biking use as important considerations to mitigate impact, and determined that placing these resources on the new bridge was more cost-effective than continuing to maintain the substructure of the existing bridge.  *Id.* at. 37.

75.     The Section 4(f) analysis described a primary purpose of the project as traffic safety and emphasized the significant volume and intensity of car and truck traffic crossing this bridge and its importance to interstate commerce, reflecting that it would not be safe for bikes or pedestrians to cross the bridge without the separated lane chosen in Modified Alternative 7. *See id.* at 6.

76.     The Section 4(f) analysis chose to mitigate historic and other human and environmental harms by imposing a Programmatic Assessment (**"PA"**) and MOA on the MDTA, which was executed July 2011 in coordination with the Maryland State Historic Preservation Officer at Maryland Historic Trust and the Virginia equivalent.

77.     Pursuant to the MOA, Defendant MDTA made the following promise (*id.* at p. 40 (emphasis added)):

> **MDTA shall construct a new public trail within Dahlgren Wayside Park that will provide access <u>from the park to the bicycle/pedestrian path on the new bridge</u>.**

78.     Ultimately, Defendants concluded that based on the considerations contained in the Section 4(f) analysis—which included the ten-foot, separated pedestrian and bike path as a critical assumption—Modified Alternative 7 was the best alternative; FHWA then declared that it had conducted all possible planning to minimize harm:

> Based on the above considerations, FHWA has determined that there are no feasible and prudent alternatives to the use of Section 4(f) land from Dahlgren Wayside Park, Potomac Gateway Welcome Center, and the NRHP eligible Nice Bridge historic site, and that Modified Alternate 7 includes all possible planning to minimize harm resulting from the use of these properties. Furthermore, FHWA has determined that Modified Alternate 7 would have a *de minimis* impact on Barnesfield Park.

## ENVIRONMENTAL ASSESSMENT/FONSI

79.     Paralleling the Section 4(f) analysis, the Environmental Assessment ("**EA**") prepared by MDTA and issued by FHWA in 2009 considered 7 alternatives (with subparts) and analyzed their impacts.  The FONSI prepared by MDTA and issued by FHWA in 2012 indicated the selection of Modified Alternative 7A, a new bridge with 4 lanes for car traffic and one barrier separated bike/ped path, as the preferred alternative.  The synopsis of public comments of the EA indicated that the most commonly voiced comment on all topics was support for the "Bike/Ped option." Exhibit B at p. 25.  Like the Section 4(f) Evaluation, the FONSI specifically links the removal of the Historic Nice Bridge with the inclusion of the bike/ped path on the new bridge, stating "with the construction of a new four land bridge ***and a two-way bike/ped path, there will***

18

*no longer be a transportation need for the existing historic bridge.*" **Exhibit B at p. 4 (emphasis added)**.

80.     The FONSI does not address demolition methodology.

81.     Although the EA mentions the possibility of blasting demolition of the Historic Nice Bridge, the EA neither evaluates alternatives nor selects explosive demolition as the preferred alternative, instead indicating that the issue would be addressed during the construction phase of the project. *See* Exhibit B (FONSI) at 19.

### THE PROJECT MATERIALLY CHANGES WITHOUT CONSIDERATION OF ENVIRONMENTAL REVIEW LAWS

82.     As late as November 21, 2016, in a press release, Governor Larry Hogan continued to promise the pedestrian and bike path on the bridge. A true and correct copy of the press release is attached hereto as Exhibit C.

83.     However, on November 21, 2019, the MDTA board voted to approve the As Built plan, which removed the bike/ped path from the project.  A public announcement to this effect was made in December 2019.

84.     Bridge construction began in 2020.

85.     During a virtual meeting on May 26, 2022, the Project's Engineer of Record ("**EOR**") indicated that although MDTA had expected to demolish the bridge mechanically, explosive or subaqueous demolition was being considered, which the EOR described as a change in scope of work.

86.     The EOR then indicated that new studies were being undertaken to look at the impact on fish species and oyster beds in the Potomac River, but no further public information has been provided to date.

87.     Upon information and belief no endangered species taking analysis has been conducted relating to demolition activities or otherwise.

88.     Upon information and belief, during the years 2020 and 2021, Defendant MDTA sought Transportation Infrastructure Finance and Innovation Act ("TIFIA") loan funding from Defendant FHWA, but Defendant FHWA held up approval of the funding until early 2022.[3]

89.     Upon information and belief, FHWA held the TIFIA approval because of concerns relating to removal of the bike/ped path and lack of sufficient review under Environmental Review Laws.

90.     By letter dated July 14, 2022, Maryland Senators Cardin and Van Hollen, and Maryland Congressman Hoyer, wrote the Secretary of the Maryland Department of Transportation asking that he delay MDTA from destroying the Historic Nice Bridge until appropriate evaluation could be undertaken.  A true and correct copy of the letter is attached hereto as **Exhibit D.**

91.     Defendant James F. Ports. Jr., wrote back that MDTA would proceed with demolition as planned.  A true and correct copy of that response is attached hereto as **Exhibit E**.

92.     Upon information and belief MDTA is preparing to demolish the Historic Nice Bridge imminently, to foreclose any further community interest in a bike/ped path.

93.     To prevent the irreparable harm caused by summary demolition of the Historic Nice Bridge without compliance with Environmental Review Laws, Plaintiffs have filed simultaneously with this Complaint and Motion for Temporary Restraining Order and Preliminary Injunction to maintain the *status quo* pending the outcome of this litigation.

---

[3] Ian Duncan, *Stalled Federal Loan Increased the Cost of Potomac River Crossing*, WASHINGTON POST (June 3, 2022, 6:00 AM),  https://www.washingtonpost.com/transportation/2022/06/03/maryland-potomac-nice-bridge/.

## LEGAL FRAMEWORK

## SECTION 4(F) OF THE DEPARTMENT OF TRANSPORTATION ACT OF 1966

94.　The Department of Transportation Act ("Section 4(f)") explicitly declares that "[i]t is the policy of the United States Government that **special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites**." 49 U.S.C. § 303 (a) (emphasis added).

95.　To implement that policy, Section 4(f) imposes substantive restrictions on federal decision-making:

> The Secretary [of Transportation] may approve a transportation program or project . . . requiring the use of publicly owned land of a public park . . . or land of an historic site of national, State, or local significance . . . *only if* (1) there is **no prudent and feasible alternative** to using that land; and (2) the program or project includes **all possible planning to minimize harm** to the park . . . or historic site resulting from the use.

49 U.S.C. § 303(c) (emphasis added).

96.　A "feasible alternative" is one that can be accomplished as a matter of sound engineering. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 411 (1971).

97.　Whether an alternative is "prudent" requires the Secretary to consider disruption to the community and the inherent value of property:

> Congress clearly did not intend that cost and disruption of the community were to be ignored by the Secretary.  But the very existence of the statutes indicates that protection of parkland was to be given paramount importance. The few green havens that are public parks **were not to be lost unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes**. If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems.

*Overton Park*, 401 U.S. at 412-13 (emphasis added).  Indeed, to use a Section 4(f) resource, the administrative record must reflect a determination that there are "unique problems or that the disruptions associated with alternatives reached extraordinary magnitudes." *Hickory Neighborhood Defense League v. Skinner*, 893 F.2d 58, 61 (4th Cir. 1990) (citing *Overton Park*, 401 U.S. at 412-13).

98.     **The requirement for "all possible planning to minimize harm" imposes an affirmative obligation on the agency not only to mitigate, but also to minimize harm to the resource before the project may be approved.**  *See Overton Park*, 401 U.S. at 411 (emphasis added).

99.     The DOT has promulgated regulations implementing the requirements of Section 4(f) (the "4(f) Regulations"), and Defendants are bound by those regulations. *See* 23 C.F.R. Part 774 *et seq*.

100.    The Section 4(f) regulations require that a Section 4(f) evaluation "include sufficient supporting documentation to demonstrate why there is no feasible and prudent avoidance alternative and shall summarize the results of all possible planning to minimize harm to the Section 4(f) property." 23 C.F.R. Part 774.7(a) (emphasis added). The "Administration shall review all Section 4(f) approvals . . . for legal sufficiency" and "the documentation supporting a Section 4(f) approval should be included in the EIS [or] EA . . . ." 23 C.F.R. Part 774.7 (d), (f).

101.    23 CFR 771.135 addresses the obligations of FHWA and DOT when a project changes.

102.    Under 23 CFR 774.9(c), after the CE, FONSI, or ROD has been processed, a separate Section 4(f) approval will be required when:

(1) A proposed modification of the alignment or design would require the use of Section 4(f) property; or

(3) A proposed modification of the alignment, design, or measures to minimize harm (after the original section 4(f) approval) would result in a substantial increase in the amount of section 4(f) property used, a substantial increase in the adverse impacts to section 4(f) property, or a substantial reduction in mitigation measures;

103.    A Section 4(f) use occurs when there is a constructive use of Section 4(f) property.  A constructive use occurs when "the transportation project does not incorporate land from a Section 4(f) property, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify the property for protection under section 4(f) are substantially impaired."  23 CFR 774.15(a).

104.    When determining whether a constructive use occurs (or not), 23 CFR 774.15(e)(3) and (f)(5) and (7) require DOT and FHWA to consider proximity impacts, including the restriction of access to Section 4(f) sites:

(e) The Administration has reviewed the following situations and determined that a constructive use occurs when:

(3) The project results in a restriction on access which substantially diminishes the utility of a significant publicly owned park, recreation area, or a historic site.

(f) The Administration has reviewed the following situations and determined that a constructive use does not occur when:

(5) Overall (combined) proximity impacts caused by a proposed project do not substantially impair the activities, features, or attributes that qualify a property for protection under section 4(f);

(7) Change in accessibility will not substantially diminish the utilization of the section 4(f) resource. . . .

**SECTION 6(F) OF THE LAND AND WATER CONSERVATION ACT OF 1965**

105.    Section 6(f) of the Land and Water Conservation Fund Act of 1965, 16 USC 460-4 *et. seq.* ("**Section 6(f)**") was enacted "to assist in preserving, developing, and assuring accessibility to all citizens of the United States of America of present and future generations and visitors . . . such quality and quantity of outdoor recreation resources as may be available and are necessary and desirable for individual active participation in such recreation and to strengthen the health and vitality of citizens of the United States" by creating the fund (the "**LWCF**"). *Id.* at 460-4.

106.    No property acquired or developed with LWCF money shall be converted to ther than public outdoor recreation uses without the approval of the Secretary of Interior.   If approved, substitution of other recreation properties of at least equal fair market value and of reasonably equivalent usefulness and location is required.   *Id.*, § 6(f)(3). The Section 6(f) evaluation typically considered alongside the Section 4(f) Evaluation or NEPA analysis.

**NATIONAL ENVIRONMENTAL POLICY ACT**

107.    NEPA is our nation's basic national charter for the protection of the environment. *See* 40 C.F.R. § 1500.1 (a).  It establishes a national policy to "prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. The Act recognizes "the critical importance of restoring and maintaining environmental quality," declares that the Federal government has a continuing responsibility to use "all practical means" to minimize environmental degradations; provides that it is "the continuing responsibility of the Federal Government to use all practical means …to the end that the Nation may . . . preserve important historic, cultural, and natural aspects of our national heritage"; and directs that, "to the fullest extent possible . . . the policies,

regulations, and public laws of the United States shall be interpreted and administered in accordance with [these] policies . . . ." *See* 42 U.S.C. §§ 4331 (a), 4331 (b)(4), 4332(1).

108.    To implement these objectives, NEPA imposes "action-forcing" requirements on federal agencies. These requirements are designed to force agencies to "look before they leap" so that harmful environmental impacts can be — and are — avoided.  To this end, NEPA requires that "environmental information [be made] available to public officials and citizens **before** decisions are made and before actions are taken."  40 C.F.R. § 1500.1 (b) (2013) (emphasis added). NEPA imposes on Federal agencies an affirmative responsibility to make sure no party takes any action that could (1) adversely impact the environment or (2) limit the Federal agency's choice of reasonable alternatives until the entire NEPA process is complete. *See id.* at 1506.1(a).

109.    Chief among NEPA's action-forcing requirements is the mandate that federal agencies prepare an Environmental Impact Statement for all "*major Federal actions <u>significantly</u> affecting the human environment."* 42 U.S.C. § 4332(C) (emphasis added). Required elements of an EIS include a description of the proposed Federal action; a detailed discussion of the proposed action's environmental impact; and an analysis of alternatives to the proposed action (and the environmental impacts of such alternatives), and notice and comment. 42 U.S.C. § 4332(C); 40 C.F.R. §§ 1502.13, 1502.14, 1502.16.

110.    If the agency's proposed action neither is categorically excluded from the requirement to produce an EIS nor would clearly require the production of an EIS, the agency may prepare a more limited Environmental Assessment ("EA"). *See* 40 C.F.R. Part 1501.4 (a)-(b). The EA is to be a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]." *Id.* at § 1508.1 (h).  An EIS is not

25

required if either there are no significant impacts or the agency commits in its FONSI to mitigation that precludes significant impact. *Friends of Back Bay v. United States Army Corps of Engineers*, 681 F.3d 581, 587 (4th Cir. 2012). A FONSI that reduces impacts below significance is often referred to as a "mitigated FONSI." *Id*.

111.  If an agency determines that there are no significant impacts so an EIS is not required, the FONSI must include the EA and demonstrate the reasons why the proposed agency action will not have a significant impact on the human environment. *See* 40 CFR § 1501.6(a).

112.  The FONSI "shall state the authority for any mitigation that the agency has adopted and any applicable monitoring or enforcement provisions. If the agency finds no significant impacts based on mitigation, the mitigated finding of no significant impact shall state any enforceable mitigation requirements or commitments that will be undertaken to avoid significant impacts." *Id.* at § 1501.6(c)

113.  The analysis of alternatives is the heart of a NEPA analysis. *Id.* at § 1502.14 (emphasis added). Reasonable alternatives "include those that are *practical or feasible* from the technical and economic standpoint . . . rather than simply *desirable* from the standpoint of the applicant" for a federal approval. 46 Fed. Reg. 18026, 18027 (Mar. 23, 1981) (emphasis original). Reasonable alternatives must then be presented together with the proposed project in comparative form *Id.*

114.  The Council on Environmental Quality ("**CEQ**") has promulgated regulations governing the implementation of NEPA (the "**CEQ NEPA Regulations**"). *See* 40 C.F.R. §§ 1500 *et seq.* . The CEQ NEPA Regulations are binding on all Defendants. The CEQ NEPA Regulations require each federal department and agency to adopt implementing

procedures.  *Id.* at 1507.3. Defendants are bound by procedures published at 23 C.F.R. Part 771 (the "**DOT-NEPA Regulations**").

115.    The DOT-NEPA Regulations explicitly set forth a policy that "[t]o the maximum extent practicable and consistent with Federal law, all environmental investigations, reviews, and consultations be coordinated as a single process, and compliance with all applicable environmental requirements be reflected in the environmental review document required by this regulation." 23 C.F.R. § 771.105 (a). **The DOT-NEPA Regulations also establish a policy requiring that "[a]lternative courses of action be evaluated and decisions be made in the best overall public interest based upon a balanced consideration of the need for safe and efficient transportation; of the social, economic, and environmental impacts of the proposed transportation improvement; and of national, State, and local environmental protection goals."** 23 C.F.R. § 771.105 (c) (emphasis added).

116.    Both the CEQ NEPA regulations (40 CFR § 1502) and the DOT NEPA regulations (23 CFR § 771.130) contemplate the preparation of Supplemental NEPA analyses whenever changes to the proposed action would result in significant impacts that were not previously evaluated:

> (a) A draft EIS, final EIS, or supplemental EIS may be supplemented at any time. An EIS shall be supplemented whenever the Administration determines that:(1) Changes to the proposed action would result in significant environmental impacts that were not evaluated in the EIS; or (2) New information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS.

23 CFR § 771.130.

117.    Even if the environmental impact is uncertain, DOT still must require supplemental environmental review:

(c) Where the Administration is uncertain of the significance of the new impacts, the applicant will develop appropriate environmental studies or, if the Administration deems appropriate, an EA to assess the impacts of the changes, new information, or new circumstances. If, based upon the studies, the Administration determines that a supplemental EIS is not necessary, the Administration shall so indicate in the project file.

*Id.*

118.    23 U.S.C. § 139 (c)(3) allows local governmental entities to "serve as a joint lead agency with the Department [of Transportation] for purposes of preparing any environmental document under [NEPA]" for grant projects and allows such entities to "prepare any such environmental document . . . *if the federal lead agency furnishes guidance in such preparation and independently evaluates such document* and the document is approved and adopted by the Secretary prior to the Secretary taking any subsequent action or making any approval based on such document."

119.    "[T]he agency bears the primary responsibility to ensure that it complies with NEPA and an EA's or an EIS's flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action."  *United States Dept. of Trans. v. Public Citizen*, 541 U.S. 752, 765 (2004).

120.    Under Executive Order 12898 (Feb. 16, 1994) (in effect in 2012) and EO 14008 (Jan. 27, 2021), as well as recent CEQ guidance and proposed rulemakings (*see* https://ceq.doe.gov/laws-regulations/regulations.html), environmental justice must be considered in the NEPA analysis, which includes identifying "disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low income populations."  EO 12898 & 14008.

## NATIONAL HISTORIC PRESERVATION ACT

121.    Section 106 of the National Historic Preservation Act ("**NHPA**") requires that, prior to issuance of a federal permit or license, federal agencies shall take into consideration the effects of that "undertaking" on historic properties. 54 U.S.C. § 306108. Agencies "must complete the Section 106 process prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license." 36 C.F.R. § 800.1(c).

122.    The NHPA defines undertaking as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including— (1) those carried out by or on behalf of the Federal agency; (2) those carried out with Federal financial assistance; (3) those requiring a Federal permit, license, or approval; and (4) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency." 54 U.S.C. § 300320; 36 C.F.R. § 800.16(y).

123.    Early in the NHPA process, an agency must determine the area of potential effects ("**APE**") of a federal undertaking. 36 C.F.R. § 800.4(a)(1). The APE is defined by regulation to include the area "within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties…. The [APE] is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking." *Id.* § 800.16(d).

124.    If the agency determines that no historic properties will be affected by the undertaking, it must provide notice of such finding to the state and tribal historic preservation offices, and the Advisory Council on Historic Preservation ("**ACHP**"), which administers the NHPA. *Id.* § 800.4(d). The regulations give those parties the opportunity to object to such a finding, which elevates the consultation process further. *Id*

125.    If the agency finds that historic properties are affected, it must provide notification to all consulting parties, and invite their views to assess adverse effects. *Id.* Any adverse effects to historic properties must be resolved, involving all consulting parties and the public. *Id.* at § 800.6. If adverse effects cannot be resolved, the process is elevated again to the ACHP and the head of the agency undertaking the action. *Id.* § 800.7. Until this process is complete, the action in question cannot go forward.

## MARYLAND ENVIRONMENTAL POLICY ACT

126.    Through the Maryland Environmental Policy Act, Section 1-302 of the Natural Resources Article of the Maryland Code ("**MEPA**"), the General Assembly of Maryland found and declared the following policies for the State of Maryland:

> **Public priority to protect, preserve, and enhance State's environment**.  (b) The protection, preservation, and enhancement of the State's diverse environment is necessary for the maintenance of the public health and welfare and the continued viability of the economy of the State and is a matter of the highest public priority.
>
> **Obligation to protect environment** (c) All State agencies must conduct their affairs with an awareness that they are stewards of the air, land, water, living and historic resources, and that they have an obligation to protect the environment for the use and enjoyment of this and all future generations.
>
> **Right of persons to healthful environment** (d) Each person has a fundamental and inalienable right to a healthful environment, and each person has a responsibility to contribute to the protection, preservation, and enhancement of the environment.
>
> **Cooperation with federal government, other state governments** (e) It is the continuing policy of the State to cooperate with the federal government, other state governments, the District of Columbia, the political subdivisions of the State, and other concerned public and private organizations and individuals, in a manner calculated to protect, preserve, and enhance the environment.

**Optimum balance between economic development and environmental quality**
(f) The determination of an optimum balance between economic development and environmental quality requires the most thoughtful consideration of ecological, economic, developmental, recreational, historic, architectural, aesthetic, and other values.

**Beneficial environmental effects of proposed actions**
(g) Beneficial environmental effects of proposed actions can be identified and measures devised to obtain these benefits if environmental evaluations are made a part of the decision-making process of the State.

**Anticipation, minimization of adverse environmental effects**
(h) Adverse environmental effects of proposed actions can be anticipated, minimized, and often eliminated if environmental evaluations are made a part of the decision-making processes of the State.

**Environmental effects reports**
(i) Environmental effects reports can facilitate the fullest practicable provision of timely public information, understanding, and participation in the decision-making processes of the State.

127. MEPA places emphasis on the consideration of environmental amenities, which include environmental and natural, as well as socioeconomic and historic impacts. *Id.* §1-301 (b).

128. Section §1-303 of MEPA requires State agencies to follow policies to ensure that:

(1) Environmental amenities and values are given appropriate consideration in planning and decision-making along with economic and technical considerations;

(2) Studies are undertaken to develop and describe appropriate alternatives to present policies, programs, and procedures that involve significant adverse environmental effects or unresolved conflicts concerning uses of available resources; and

(3) Planning and decision-making involving environmental effects are undertaken with the fullest practicable provision of timely public information and understanding and in coordination with public and private organizations and individuals with jurisdiction by law, special expertise, or recognized interest.

129.    Section 1-304 of MEPA additionally requires that every State agency prepare an

Environmental Effects Report ("**EER**") to include a discussion of the following topics:

> (1) The effects of the proposed action on the environment, including adverse and beneficial environmental effects that are reasonably likely if the proposal is implemented or if it is not implemented;

> (2) Measures that might be taken to minimize potential adverse environmental effects and maximize potential beneficial environmental effects, including monitoring, maintenance, replacement, operation, and other follow-up activities; and

> (3) Reasonable alternatives to the proposed action that might have less adverse environmental effects or greater beneficial environmental effects, including, the alternative of no action.

130.    The EER must also address the following:

> (1) Comment upon the proposed State action by public and private organizations and individuals with jurisdiction by law, special expertise, or recognized interest prior to the request for legislation;

> (2) The possibility of the preparation of single program environmental effects reports if a series of actions taken individually are of minimal significance but if the cumulative effect of the actions on the environment is significant or if a series of actions are related either geographically or as logical parts in a chain of contemplated actions;

> (3) The possibility of the preparation of modified environmental effects reports on remaining decisions significantly affecting the quality of the environment that are parts of actions begun before but not completed by July 1, 1974; and

> (4) The issuance of guidelines, in accordance with this subtitle and pursuant to the guidelines issued by the Secretary of Natural Resources, for the preparation of environmental effects reports by each State agency that takes actions that significantly affect the quality of the environment.

## ADMINISTRATIVE PROCEDURE ACT

131.    Pursuant to the Administrative Procedure Act ("**APA**"), 5 U.S.C. §§ 701-706, a

court reviewing a final agency action must "hold unlawful and set aside agency action, findings,

and conclusions found to be . . . (A) arbitrary and capricious, an abuse of discretion, or otherwise

not in accordance with law," or "without observance of procedure required by law." 5 U.S.C.

§§ 706(2)(A),(D) & 709(2).

## CLAIMS FOR RELIEF

### COUNT I:
### DEFENDANTS VIOLATED THE AFOREMENTIONED ENVIRONMENTAL REVIEW LAWS BY CHANGING THE PROJECT WITHOUT STUDYING, PLANNING FOR OR OTHERWISE CONSIDERING THE MATERIAL IMPACT OF THAT CHANGE (COLLECTIVE COUNT)

132.    Plaintiffs reallege and reassert preceding the allegations as if fully stated herein.

133.    Applied       here,       the       Environmental       Review       Laws       require

environmental/human/historic impacts to be studied and all possible planning to occur to

mitigate impacts before undertaking the proposed action.

134.    In 2012, Defendants undertook impact studies and selected Modified

Alternative 7, which they claimed in the 2012 Final Section 4(f) Evaluation, and to a lesser

extent in the NEPA EA, mitigated harm to Section 4(f) and Section 6(f) properties, as well as

environmental and human resources.

135.    The selected 2012 Modified Alternative 7 chose to destroy the Historic Nice

Bridge based on the mitigation measure of including a ten-foot separated /bike/ped path on the

new bridge, as well as a significant shoulder area, and the requirement that the new bike/ped path

be connected by MDTA to Section 4(f) and Section 6(f) sites on the Virginia side of the river.

136.     Defendants never appropriately analyzed the As Built alternative whereby they would both destroy the Historic Nice Bridge while constructing the new bridge <u>without</u> a separated 10-foot bicycle lane and with only a two-foot shoulder, and Defendant MDTA justified this change by expressing economic concerns.  *See* Exhibit E.

137.     Each of the Environmental Review Laws require Defendants to assess the impact of the project <u>before</u> taking action.

138.     In violation of each of the Environmental Review Laws, Defendants built a different project than evaluated, meaning that the As Built plan never was considered under the Environmental Review Laws.

139.     The primary remaining opportunity to avoid further adverse harm caused by Defendants' unlawful action is to enjoin the imminent demolition of the Historic Nice Bridge, as well as federal funding for the project (including TIFIA), and State funding allocated by the Maryland Legislature and used by MDTA for the project (in connection with MDTA's MEPA violation) until such time as Defendants perform a legally sufficient analysis under Environmental Review Laws.

140.     Defendants DOT and FHWA have given federal permissions and provided federal funding for the Project, including after Defendant MDTA changed the Project.

141.     Defendants' actions are illegal and directly contradict the Environmental Review Laws.

142.     Plaintiffs seek the declaratory and injunctive relief set forth at the conclusion of all of their counts.

### COUNT II:
### DEFENDANTS' VIOLATED SECTION 4(F) OF THE DOT ACT OF 1966

143.     Plaintiffs reallege and reassert the preceding allegations as if fully stated herein.

144.     Section 4(f) provides that the Secretary [of Transportation] may approve a transportation program or project . . . requiring the use of publicly owned land of a public park . . . or land of an historic site of national, State, or local significance . . . *only if* (1) there is **no prudent and feasible alternative** to using that land; and (2) the program or project includes **all possible planning to minimize harm** to the park . . . or historic site resulting from the use.

145.     Section 4(f) requires that this analysis "shall be evaluated as early as practicable in the development of the action **when alternatives to the proposed action are under study**," which evaluations shall "include sufficient supporting documentation . . . ." 23 C.F.R. §§ 774.7, 774.9 (a).

146.     DOT/FHWA must re-assess the Section 4(f) analysis when material changes have been made that impact Section 4(f) properties, the environment or historic resources.  23 C.F.R. 771.130.

147.     Given the importance that Section 4(f) places on parkland and historic property, "the administrative record [must] indicate that the Secretary determined that there were unique problems or that the disruptions associated with alternatives reached extraordinary magnitudes." *Hickory Neighborhood Def. League v. Skinner*, 893 F.2d 58, 61 (4th Cir. 1990)

148.     Defendants identified three Section 4(f) resources, which are primarily parks for recreational use, immediately on the Virginia side of the bridge.

149.     Defendants chose Modified Alternative 7, which included a ten-foot, separated bike and pedestrian path, to provide micro-modality access to those parks and to preserve the historic character of the area given the planned demolition of the Historic Nice Bridge.

150.    Defendants used the 10-foot, separated bike/ped path to support their conclusion that they had conducted all "all possible planning" to mitigate impact on Section 4(f) sites, and to otherwise mitigate historic and environmental impacts (Exhibit A at p. 37 (emphasis added)):

> Modified Alternate 7 proposes a single two-way bike/ped path on the south side of the new bridge. Compared to constructing two one-way paths (as presented with Alternate 7 in the Draft Section 4(f) Evaluation), a single two-way path results in less encroachment into Dahlgren Wayside Park and reduces the project cost by approximately seven percent. Consideration was also given to placing the path on the north side of the new bridge. This would locate the path closer to the park and enhance park amenities; however, a path loop beneath the west end of the bridge could also potentially result in greater encroachment into the park. Consideration for placing the path on either the north or south side of the new bridge will continue during final design. **Park and recreational facilities on either side of the bridge would be fully accessible by the bike/ped path, regardless of the path location.**

151.    The 10-foot separated/bike/ped path also formed part of the mitigation of historic impact, and Defendant MDTA committed to connect the new bridge bike and pedestrian path to Section 4(f) resources in the MOA, to mitigate historic and other impacts (*id.* Exhibit A, Appendix D at p. 40-41 (emphasis added)):

> Mitigation has been incorporated into Modified Alternate 7 for Section 4(f) uses that cannot be avoided or further minimized. These mitigation measures have been determined through consultation with the officials having jurisdiction over each resource. For historic sites, the Draft Section 4(f) Evaluation anticipated that mitigation measures would be documented in a Memorandum of Agreement (MOA) per Section 106 of the National Historic Preservation Act. . . . Mitigation measures in the MOA, executed in September 2011, were developed in coordination with VDOT, FHWA, NPS, VTC, the Virginia Department of Conservation and Recreation (DCR), and King George County, and include the following: . . . **MDTA shall construct a new public trail within Dahlgren Wayside Park that will provide access from the park to the bicycle/pedestrian path on the new bridge**. The Dahlgren Wayside Park entrance and parking lot will be relocated. Hardscape features such as picnic tables, flagpoles, replacement boat landing, and barbecue grills shall be installed.

**Based on the evaluation presented in this section, Modified Alternate 7 includes all possible planning to minimize harm.**

152.   All possible planning did not occur because the bridge was not constructed with either a bike and pedestrian path or twelve-foot shoulders, which might have provided at least some access for bike/ped. crossing.

153.   No documentation exists demonstrating that all possible planning was conducted to minimize harm caused by constructing the bridge without the promised 10-foot ped./bike path or twelve foot shoulders, while also demolishing the Historic Nice Bridge.

154.   No documentation exists to demonstrate that the new bridge plan assessed all feasible and prudent alternatives to avoid the taking of Section 4(f) sites and other adverse impacts on the human and natural environment.

155.   No re-assessment has occurred relating to the As Built bridge.

156.   The 2012 Final Section 4(f) Evaluation fails entirely to reflect the As Built bridge, or the environmental, section 4(f) or historical impacts of the later-developed As Built plan.

157.   The As Built Bridge lacks the required Section 4(f) evaluations.

158.   Defendant, MDTA's recent apparent choice to use explosives to detonate the Historic Nice Bridge has not been evaluated by DOT or FHWA under Section 4(f), nor, to information and belief, has this plan been evaluated by the NMWS, as required by the FONSI.

159.   Defendants' actions are illegal and directly contradict Defendants' obligations under Section 4(f) of the DOT Act of 1966, and DOT's regulations for implementing that law.

160.   Defendants DOT and FHWA have given federal permissions and provided federal funding for the Project, including after Defendant MDTA changed the Project.

161.   Plaintiffs seek the declaratory and injunctive relief set forth at the conclusion of all of their counts.

## COUNT III
## DEFENDANTS VIOLATED
## THE NATIONAL ENVIRONMENTAL POLICY ACT

162.   Plaintiffs reallege and reassert the preceding paragraphs, as if fully stated herein.

163.   NEPA requires that federal agencies prepare EISs on all "major Federal actions significantly affecting the human environment." 42 U.S.C. § 4332(2)(C).

164.   NEPA, Section 4(f) and the NHPA all provide that for environmental reviews to be meaningful, they must be completed as early as practicable and ___*before*___ decisions are made or actions are taken.

165.   NEPA requires that environmental information [be made] available to public officials and citizens before decisions are made and before actions are taken, and imposes an affirmative responsibility to make sure no party takes any action that could (1) adversely impact the environment or (2) limit the Federal agency's choice of reasonable alternatives until the entire NEPA process is complete.  *See id.* at 40 C.F.R. Part 1506.1 (a).

166.   Under NEPA a Federal agency "shall" determine whether to complete an EIS based on the EA.  40 C.F.R. Part 1501.4 (c).  If, pursuant to the EA, an agency determines that an EIS is not required under applicable CEQ regulations and no categorical exclusion applies, it must issue a [FONSI].  *Id.*

167.   Defendants acknowledged that community members commented and made clear to Defendants prior to 2012 that having a pedestrian and bike crossing of Potomac River at this location is of vital importance to the human environment and for access to parks, trails and Section 4(f) resources.  Exhibit B at 25.

168.    Defendants acknowledged that the Historic Nice Bridge is eligible for listing on the NRHP given its architectural significance and that mitigation was necessary to mitigate this impact.  Exhibit B at 12-13.

169.    The EA proposed the selection of Alternative 7, which called for 2 separated lanes of pedestrian and bicycle traffic to address community access concerns and mitigate the impact of destroying the historic bridge (and not preserving it for recreational/historic preservation use).

170.    The FONSI, issued in October 2012, identified Modified Alternative 7 as the Preferred Alternative.  Modified Alternative 7 consists of installation of a new bridge north of the existing bridge with 4 vehicular travel lanes and a single 10 foot barrier-separated two-way bike/ped path on the south side of the new bridge. *See* Exhibit B at p. 3 and Appendix A.

171.    The selected Modified Alternative 7 in the Final Section 4(f) Evaluation cut the two lanes down to one lane, but nevertheless ensured that pedestrian and bicycle traffic could safely cross the bridge.

172.    The As Built bridge deletes the separated bike/ped path without any consideration or reconsideration of human and environmental impacts of that decision.

173.    No NEPA analysis has been conducted that supports demolishing the Historic Nice Bridge without the promised bike/ped path on the new bridge.

174.    No NEPA re-assessment has occurred relating to MDTA's choice to demolish the old bridge but build the new without the promised ped./bike lane

175.    Defendants' EA provides that demolition decisions, including review of alternatives and  mitigating environmental impact will be made at the time of construction:

      a.  "During final design, the construction methods and the temporary impacts of construction and demolition (if needed) would be determined."  EA, Section III.C.3.c  (Existing    Environment    and    Environmental    Impacts/Natural

Environmental Resources/Waters of the US including Wetlands/Avoidance and Minimization Measures (page III-30).

b. "As the project continues, additional efforts would be made to identify construction methods to avoid and minimize aquatic biota mortality associated with dredging, pile construction and demolition." EA, Section III.C.8.c (Existing Environment and Environmental Impacts/Natural Environmental Resources/Aquatic Habitat and Wildlife/Avoidance and Minimization Measures (page III-40)

176.    MDTA's project engineer acknowledged in May that explosive demolition is being considered and that environmental and fish studies are underway. Nonetheless, MDTA also states that demolition of the bridge has already begun or at least is being planned at this time for immediate implementation. *See* Exhibit E.

177.    Upon information and belief no alternatives analysis or appropriate approval after consultation with NMFS or other federal agencies has occurred, relating to the impact on environmental and human resources of using explosives to demolish the Historic Nice Bridge and yet, upon information and belief, the DOT and FHWA have provided all permissions and funding necessary for the project without having undertaken or requiring appropriate consideration under NEPA (and the other Environmental Review Laws).

178.    The form of demolition, whether explosive or otherwise, has not been studied for environmental impact, impact on Section 4(f) or Sectoin 6(f) resources or impact on historic resources.

179.    Using explosives to demolish parts of the Historic Nice Bridge or the rubble from the bridge to create a "reef" has not been evaluated appropriately for the impact on the natural habitat and human environment, including the taking of endangered species or disruption of their habitats. *See* Exhibit E (describing he demolition and reef plan).

180.    The demolition plan was not sufficiently evaluated in the 2012 FONSI and Section 4(f) Evaluation, each of which deferred that full analysis until construction. *See* Ex. A at 22; Ex. B at 19.

181.    The plan to demolish the Historic Nice Bridge and use parts of it as a reef is at least of questionable significant adverse environmental impact (if not a certain environmental impact), mandating an EIS.

182.    In addition, NEPA requires that Defendants consider the cumulative impact of their project, 42 U.S.C. § 4332(2)(C), and Defendants may not segment the project to avoid a finding of significant environmental impact.

183.    Defendants never considered the cumulative effects of the As Built Bridge plus the demolition of the Historic Nice Bridge on human, environmental, historic and Section 4(f) resources.

184.    Defendants inappropriately segmented the project by pushing the demolition decision away from the initial construction plan, thereby relying on a FONSI that lacked evaluation of construction or demolition.   When Defendants changed to the As Built configuration and demolition plan, that decision lacked even a FONSI, let alone an EIS.

185.    NEPA further requires an assessment of environmental justice that has not been made for the combination As Built Bridge plus demolition of the Historic Nice Bridge.

186.    The Maryland County adjacent to the bridge is Charles County, and Charles County has a majority 60% minority or non-white population.

187.    The Section 4(f) and Section 6(f) park and recreational facilities considered in the Final Section 4(f) Evaluation and attached MOA are in King George County on the Virginia side of the Potomac River, which is predominantly white.

188.     Defendants' choice to delete safe bike and other non-motorized passage, as well as ANY pedestrian passage, prevents a majority non-white county from walking or biking to Section 4(f) or Section 6(f) federally-funded resources, including parks, beaches and other well-preserved lands on the majority white side of the Potomac River.

189.     Defendants DOT and FHWA, as well as ancillary agencies such as the NMFS and DOI are prohibited from giving federal permissions or approvals or providing funding without first conducting appropriate NEPA review

190.     Accordingly, Defendants' actions (including providing federal money to MDTA under these changed circumstances or otherwise providing necessary federal permits or approvals) are illegal and directly contradict the obligations of NEPA to study impacts before a decision is taken, money is provided or, in this case, a bridge is demolished.

191.     Plaintiffs seek the declaratory and injunctive relief set forth at the conclusion of all of their counts.

## COUNT IV
## DEFENDANT VIOLATED SECTION 6(F) OF THE LAND AND WATER CONSERVATION FUND ACT OF 1965

192.     Plaintiffs reallege and reassert the preceding paragraphs, as if fully stated herein.

193.     The LWCF creates a strong prohibition on the taking of lands receiving this funding source to protect federal investments and the quality of federally assisted recreational resources.

194.     Barnesfield Park in Virginia received grant funding from the National Park Service through the LWCF, and other parks in Virginia are subject to contractual agreements and covenants with the United States relating to their preservation.

195.     Parts of Barnesfield Park were taken in connection with the new bridge, and Defendants agreed to the MOA to ensure that Section 6(f) Property maintained equal or greater value for recreational use, as required by law.  *See* Exhibit A, Appendix D.

196.     In the MOA, MDTA was required to connect Virginia park property to a bike/ped path on the new bridge, thereby enabling greater recreational access to Section 6(f) (and Section 4(f)) property and mitigating the harm to these resources.

197.     Defendant MDTA built the bridge but changed the configuration of the As Built Bridge, violating the MOA and using/restricting Section 6(f) park land without providing a mitigating benefit of equal or greater value, such as the provision of recreational access for southern Marylanders required in the MOA.

198.     Defendants DOT and FHWA approved TIFIA loans and provided other permissions and approvals despite MDTA violating the MOA and otherwise failing to abide by the protections of Section 6(f).

199.     Upon information and belief, the National Park Service did not approve the As Built project in connection with the use/restriction of Section 6(f) land.

200.     Plaintiffs seek the declaratory and injunctive relief set forth at the conclusion of all of their counts.

## COUNT V
## DEFENDANT VIOLATED THE NATIONAL HISTORIC PRESERVATION ACT

201.     Plaintiffs reallege and reassert the preceding paragraphs, as if fully stated herein.

202.     The NHPA Section 106 regulations also stress the importance of considering the effects of a federal project at the earliest possible time, "so that a broad range of alternatives may be considered during the planning process for the undertaking." 36 C.F.R. § 800.1 (c).  More specifically, the Section 106 regulations (1) require that NHPA review be completed "prior to"

the approval of any expenditure of federal funds on a project; and (2) prohibit agencies from taking any action that could "restrict the subsequent consideration of alternatives to avoid, minimize or mitigate" damage to historic properties until the NHPA process is complete. 36 C.F.R. 800.1(c).

203.  Defendants acknowledge the severe adverse impact to the Historic Nice Bridge, which is eligible for listing on the NRHP.

204.  To mitigate the historic impact of destroying the Historic Nice Bridge, Defendants entered into a Section 106 Programmatic Agreement ("**PE**") (Attachment C to Exhibit A) and MOA (Appendix D to Exhibit A).

205.  As described above, the Final Section 4(f) analysis relied on MDTA's promise in the MOA to build a path from the Section 4(f) resource at Dahlgren Park to the ped./bike path on the bridge for the purpose of access.

206.  Among other things, Defendants described this decision as mitigating the impact of destroying the Historic Nice Bridge and mitigating harm to historic resources.

207.  Specifically, stipulation VI of the MOA requires MDTA to undertake the following action to mitigate environmental/historic impacts in direct response to a 2009 public hearing:

> As a result of comments received during the 2009 Public Hearing comment period, minor modifications were made to Alternate 7 to create a more cost-effective, and less environmentally-impactive alternate. The minor modifications made to Alternate 7 include the consolidation of two one-way bicycle/pedestrian paths into a single two-way path, and the paths on each shore that are needed to transition the bicyclists/pedestrians from the bridge to the appropriate shoulder of US 301.

* * *

Minimization measures have been employed, and will continue to be considered as the project advances to final design. The project footprint, and corresponding impacts, have been reduced by the choice of an alternative that would construct a single four-lane bridge rather than two parallel bridges. The consolidation of two bicycle/pedestrian paths into a single path also reduces the encroachment of relocated Orland Park Road onto the Aqua-Land property. Finally, by accommodating the bicycle/pedestrian path on the south side of the bridge rather than the north, the grade-separated loop path beneath the bridge can be constructed without encroaching into Dahlgren Wayside Park.

208.    Each of the Final Section 4(f) Evaluation, the EA, the PA and the MOA relied on the bike/ped path to mitigate adverse impacts to the human environment, parks and historic resources.

209.    Defendants action to remove the bike/ped path without considering the historic impact, among other impacts, is unlawful.

210.    Defendants' possible choice to detonate explosives to demolish the Historic Nice Bridge or create a reef has not been sufficiently considered for visibility and other historic, environmental or human impacts and requires the level of historic analysis and coordination typically performed in an EIS, as opposed to in a decade-old EA.

211.    Plaintiffs seek the declaratory and injunctive relief set forth at the conclusion of all of their counts.

**COUNT VI:**
**DEFENDANTS VIOLATED THE**
**MARYLAND ENVIRONMENTAL POLICY ACT**

212.    Plaintiffs re-allege and preceding paragraphs as if fully stated herein.

213.    MEPA applies to State agencies receiving funding from the Maryland legislature for projects.

214. The Project is financed through money loaned by the federal government, as well as toll revenue allocated to MDTA by the Maryland legislature.

215. MDTA, therefore, must follow the MEPA in this Project.

216. MEPA requires preparation of an Environmental Effects Report ("**EER**").

217. Upon information and belief, no EER was drafted before funding for the project was allocated by the Maryland legislation.

218. Like NEPA, the EER requires that MDTA study adverse environmental impacts (which include impacts to the human environment) and to identify measures that might be taken to minimize adverse environmental effects and maximize beneficial environmental effects, as well as reasonable alternatives.

219. To the extent the EA and Final Section 4(f) Evaluation drafted by Defendants qualifies as an EER, the EA and Final Section 4(f) Evaluation both identify a significant adverse impact to having no bike or pedestrian crossing of the bridge and mitigate that harm by providing for a 10-foot travel lane in the new bridge.

220. By unilaterally removing that bike/ped path and reducing the shoulder from 12 feet to 2 feet, MDTA violated MEPA because it never prepared an EER assessing the impact of the As Built Bridge or identified actions that could increase beneficial the environmental/human impacts while minimizing the adverse ones.

221. Alternatively, MDTA did not prepare an EER and the Final Section 4(f) Evaluation and EA do not count toward meeting this independent requirement.

222. MDTA violated MEPA by failing to assess the As Built Bridge in an EER and by failing to identify or even consider the environmental/human impacts of removing the promised ped./bike lane while also destroying the bridge.

223.    MDTA violated MEPA by failing to sufficiently assess a demolition plan for environmental impacts before commencing demolition planning.

224.    Plaintiffs seek the declaratory and injunctive relief set forth at the conclusion of all of their counts.

**COUNT VII**
**MDTA LACKS SUFFICIENT AUTHORITY TO DETONATE OR DEMOLISH THE HISTORIC NICE BRIDGE UNDER THE ENVIRONMENTAL LAWS TYPICALLY INFORMING THE NEPA ANALYSIS**

225.    Plaintiffs re-allege and preceding paragraphs as if fully stated herein

226.    Upon information and belief, Defendant, MDTA, rests its demolition and/or detonation authority on a 2012 FONSI and Final Section 4(f) Evaluation.

227.    Upon information and belief, Defendant, MDTA, currently plans to demolish the Historic Nice Bridge using explosives.

228.    The 2012 FONSI did not squarely address this demolition, choosing instead to defer that consideration to the time of construction.

229.    No EIS was provided in connection with a deferred construction and operation plan.

230.    Had an EIS been performed on the construction and operation plan for the bridge once that construction and operation plan became known, various federal agencies would have reviewed the plan for consistency with other environmental laws that apply directly to MDTA's proposed action, including, but not limited to, the following:

(a) Section 404 of the Clean Water Act, 33 USC § 1344 *et seq*.

(b) the Coastal Zone Management Act, 16 U.S.C. § 1451 *et seq.*;

(c) the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*;

(d) the Rivers and Harbors Act, 33 USC § 401 *et seq.*

231.    Although selected Modified Alternative 7 was reviewed for consistency with other environmental laws in 2012, those reviews were based on Modified Alternative 7 and did not consider alternatives for a construction operation plan or demolition plan.

232.    Had the construction and operations/demolition plan been articulated by Defendant MDTA to Defendants DOT and FHWA in 2012, a FONSI could not have issued, and Defendants would have had to have undertaken an EIS,

233.    When Defendants DOT and FHWA learned that MDTA would build a different bridge than the bridge studied, as well as the specifics of MDTA's demolition plan, it could not give additional permissions/approvals or authorize federal funding without requiring environmental assessment of this plan, as well as vetting through the various federal agencies with jurisdiction over laws that are typically wrapped into the NEPA process.

234.    Given the 2022 reality of the As Built Bridge and demolition plan, Defendants reliance on the 2012 Section 4(f) Evaluation and FONSI is entirely outdated, such that Defendants plans, including its demolition plan, are not consistent with the various environmental laws typically considered or wrapped into the NEPA evaluation.

235.    In this regard, Defendant, MDTA, lacks appropriate federal authorization to demolish the Historic Nice Bridge under the other environmental laws typically considered within a NEPA analysis.

236.    Plaintiffs seek the declaratory and injunctive relief set forth at the conclusion of all of their counts.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiffs respectfully request that this Court:

1.      Issue a declaratory judgment that

      a.   Defendants have violated Section 4(f), Section 6(f), the NEPA, the NHPA, the MEPA and the APA, as well as other environmental laws ancillary to these reviews; and

      b.   Defendants' position is not substantially justified.

2.      Order Defendants to undertake all work necessary and appropriate under Environmental Review laws, including but not limited to following:

      a.   Supplement their 2012 Final Section 4(f) analysis (i) to account for MDTA's actual bridge construction plan and (ii) to select the actual demolition plan after conducting all possible planning to mitigate impact and considering the alternatives;

      b.   Supplement their 2012 EA or perform an EIS, as appropriate, (i) to account for MDTA's actual bridge construction plan; and (ii) to select the actual demolition plan after considering the environmental, historic and species-related impacts of that plan, reasonable alternatives, as well as how to mitigate impacts;

      c.   Create an EER that undertakes the analysis required by the MEPA, including public meetings and comment, to reflect the project in the As Built condition;

      d.   Undertake the process, including public meetings and comment, to develop a new EA or EIS, as appropriate, addressing the alternative of a new bridge without a pedestrian lane or otherwise reflecting the Project in the actual As Built Bridge condition, which shall include review under the NHPA, executing a new PA or MOA reflecting the actual project, as well

as addressing environmental justice and all other considerations necessary and appropriate under NEPA pursuant to present-day laws, regulations and guidance;

e. Undertake the process to comply with the MEPA;

f. Obtain all necessary permits, approvals and consistency reviews customarily required or wrapped into the NEPA analysis, including but not limited to compliance with the CWA, CZMA, ESA and Rivers and Harbors Act; and

g. All other relief or conditions deemed necessary by the Court to ensure Defendants full compliance with Environmental Review Laws and all applicable laws.

3. Enjoin Defendants from the following activities until Defendants comply fully and faithfully with the Environmental Review Laws and the above Order:

a. Defendants shall not demolish, provide permission to demolish or fund demolition of the Historic Nice Bridge, including but not limited to all activities relating to planning demolition, except as allowed by this Court in compliance with the above Order;

b. Defendants, DOT and FHWA, shall not provide any authorizations, permissions or federal funding to the MDTA (or any other Maryland entity) for use on this Project (whether or not previously approved), except as allowed by this Court in compliance with the above Order;

c. Defendant, MDTA, shall not take any action on this Project except as authorized by Order of this Court; and

    d. All other relief or conditions deemed necessary by the Court to ensure Defendants full compliance with Environmental Review Laws and all applicable laws.

4.    Award Plaintiffs their costs, including attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (d) and 54 U.S.C.A. §307105 (awarding prevailing party attorney fees for governmental violations of the NHPA).

5.    Grant such other and further relief as the Court deems just and proper.

Dated: September 28, 2022

    Respectfully submitted,

    Thomas K. Prevas (Bar No. 29452)
    Anamika R. Moore (Bar No. 21689)
    **SAUL EWING ARNSTEIN & LEHR, LLP**
    1001 Fleet Street – 9th Floor
    Baltimore, Maryland 21202
    (410) 332-8683 (telephone)
    (410) 332-8785 (facsimile)
    thomas.prevas@saul.com
    anamika.moore@saul.com

    ***Counsel for Plaintiffs Potomac Heritage Trail Association, Inc. and Dahlgren Railroad Heritage Trail. Inc.***