# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **POTOMAC HERITAGE TRAIL ASSOCIATION, INC.,** *et al.* | * |
| Plaintiff, | * |
| v. | * |
| | Civil Action No: 8:22-cv-02482-DLB |
| | * |
| **UNITED STATES DEPARTMENT OF TRANSPORTATION,** *et al.* | * |
| | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs, Potomac Heritage Trail Association, Inc., Dahlgren Railroad Heritage Trail, Inc., and Oxon Road Bicycle and Trail Club, Inc., by and through undersigned counsel, in reply to Defendants United States Department of Transportation ("**DOT**"), the Federal Highway Administration ("**FHWA**") and the Maryland Transportation Authority ("**MDTA**"), as well as their officers, (collectively the "**Defendants**").[1] Plaintiffs responds to both Defendants' opposition to the Motion as follows:

As an initial matter, Defendants criticize Plaintiffs for filing a motion "at the eleventh hour," insinuating that doing so was by design or in an effort to cause harm or delay. This is not the case. Plaintiffs believe they are acting in the best of the public's interest and reflect that genuine interest through their choice not to seek an injunction relating to the completion of the new Nice Bridge, recognizing that the new bridge can and should open on time. Plaintiffs have

---

[1] All terms used herein but not defined herein have the meaning ascribed to them in Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

consistently maintained, both in communications with Defendants and elected officials, that modern transit planning demands multi-modal resources, that Defendants concluded in 2012 that they had conducted all possible planning and mitigated environmental and historic harms *because* they would provide multi-modal resources on the new bridge, that Defendants removed the multi-modal resources from the new bridge for cost reasons without accounting for their critical mitigation impact, and that the Historic Nice Bridge presents an opportunity to mitigate the environmental, human and historic harms that were not adequately considered.

Moreover, Defendants' "plan" to demolish the Historic Nice Bridge appears to be changing before our eyes, was not addressed in the original 2012 Section 4(f) Evaluation or FONSI (as indicated in the Complaint and Motion) and is not meaningfully addressed in the 2019 Reassessment.[2] The act of demolishing the Historic Nice Bridge—like the act of building the new span—requires both permits and funding from state and federal sources that trigger an environmental review before the action is undertaken. Defendants lack appropriate documentation of this proposed action—the demolition action—and ever changing statements about project schedule and demolition methods demonstrate that Defendants are not "looking before they leap" concerning the demolition, as the environmental review laws require them to do. Indeed, Defendant MDTA concedes through the Declaration of Brian Wolfe, PE (attached as Exhibit F to their Opposition) that the demolition plan has not been finalized nor has all permitting been completed. *See* Aff. at ¶9-12 (explaining that MDTA wishes to begin demolition now but has not decided on whether ultimate use of subaqueous explosives will be necessary to

---

[2] In its 2019 Report, MDTA indicated that it would provide a website with its NEPA documents. Plaintiffs regularly checked that website and only the 2012 Section 4(f) Evaluation and 2012 FONSI were posted. Aff. of . In addition, to date that website still reflects that demolition would not begin until Spring 2023. Plaintiffs assert that these types of communications challenges have occurred throughout the project, particularly after MDTA changed the project plan. *See* Exhibit C to State Defendants' Motion for Temporary Restraining Order and Preliminary Injunction; Exhibit 2 to Federal Defendants' Motion for Temporary Restraining Order and Preliminary Injunction.

complete the work). Specifically, Mr. Wolfe acknowledges that MDTA does not even know how it will complete demolition at this time and lacks the permitting and government consultation required if MDTA sticks with the concept of using sub-aqueous explosives: **"whether to use sub-aqueous explosives is still under consideration. No permit modification/application to allow the use of sub-aqueous explosives has been submitted or obtained."** MDTA Oppo. Ex. F at ¶12 (emphasis added).

Defendants ever-evolving demolition plan and timelines demand that the Court arrest the demolition of the bridge on October 13, until appropriate planning, permitting and environmental reviews may be had. As Plaintiffs point out in their Complaint and Motion, NEPA and environmental review provides a permit wrapping function that notifies various federal agencies of actions required. Skipping environmental reviews for the demolition project, as Defendants have done here, likely means that important permitting and consultation with non-primary agencies (e.g. EPA, Coast Guard, DOI, etc.) also have been skipped. Defendant MDTA practically concedes this point when acknowledging that it lacks regulatory authority to complete the demolition (or otherwise does not know how it will complete the demolition). Ex. F at ¶11-12. The idea that Defendants will move up the demolition commencement date by three months from their previously stated timeline and figure out how to complete demolition sometime later flies in the face of the Environmental Review Laws, as well as major permitting laws, and demands that this Court take immediate action to stop the demolition.

**A. Plaintiffs are Likely to Succeed on the Merits of Their Claims.**

A plaintiff can obtain a preliminary injunction only if it first establishes that it is likely to succeed on the merits. *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346–47 (4th Cir. 2009). A plaintiff does not have to show "certainty of success," but must make a clear showing

that they are likely to succeed at trial. *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013); *MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339-240 (4th Cir. 2001). Likelihood of success on the merits to grant a preliminary injunction "by no means represents a determination that the claim in question will or ought to succeed ultimately; that determination is to be made upon the deliberate investigation that follows the granting of the preliminary injunction." (internal quotations omitted) *Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 276 (4th Cir. 2002). Where a moving party for a preliminary injunction alleges multiple causes of action, the party may prevail if it shows that it is likely to succeed on at least one of said claims. *XL Specialty Ins. Co. v. Bighorn Constr. & Reclamation, LLC*, No. CV 21-3068-BAH, 2022 WL 2105925, at *6 (D. Md. June 10, 2022).

### 1. Defendants violated Section 4(f).

Defendants' briefs focus on NEPA and spent very little time discussing the parameters of Section 4(f). Indeed, the DOT writes that NEPA requires Defendants only to study environmental harms, but Section 4(f) requires the government to do more. Section 4(f) provides the following on federal decision-making:

> The Secretary [of Transportation] may approve a transportation program or project . . . requiring the use of publicly owned land of a public park . . . or land of an historic site of national, State, or local significance . . . *only if* (1) there is **no prudent and feasible alternative** to using that land; and (2) the program or project includes **all possible planning to minimize harm** to the park . . . or historic site resulting from the use.

49 U.S.C. § 303(c) (emphasis added). A "feasible alternative" is one that can be accomplished as a matter of sound engineering. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 411 (1971). Section 4(f) is different than NEPA in that it is action forcing. That is, the FHWA and DOT cannot undertake a project, provide federal funding or federal permitting, without

undertaking all possible planning to mitigate harm to Section 4(f) property. Loss of access is a constructive harm to Section 4(f) property.

Defendants concede that even under their 2019 NEPA Re-Evaluation, Section 4(f) property will be taken. 2019 NEPA Re-Evaluation at 51[3]. The 2012 FONSI and Section 4(f) Evaluations identify this harm and regard the multi-modal bridge connected to the Section 4(f) (and Section 6(f)) parks and resources in Virginia as the method to mitigate that harm and conduct all possible planning. 2019 NEPA Re-Evaluation at 53. In the 2019 Re-Evaluation, Defendants stripped multi-modal, barrier-separated bike and pedestrian path from the project, together with both 10-foot shoulders. 2019 NEPA Re-Evaluation at Attachment A-4, Table 1. The bridge remained scheduled for demolition, and the parks remain impacted, but without the mitigating factor of improved access by way of separated bike/pedestrian path. The 2019 Reevaluation did not conduct all possible planning to mitigate actual or constructive harms to Section 4(f) property, because the property is still being taken as it was in 2012, but the form of mitigation—the improved access—was removed. Removing the mitigation factor for cost reasons and not studying and selecting a prudent alternative is not the analysis demanded by Section 4(f) and the environmental review laws. Certainly cost concerns in an infrastructure project are not the type of "disruption of an extraordinary magnitude" that would permit a taking of Section 4(f) resources without the type of significant mitigation planned in Modified Alternative 7 of the 2012 Section 4(f) Evaluation. *See Hickory N'hood Def. League v. Skinner*, 893 F.2d 58, 61 (4th Cir. 1990).

   2. **Defendants Violated NEPA.**

As set forth in the Complaint and Plaintiffs' Motion, NEPA requires that Defendants

---

[3] The Reevaluation is Exhibit A to Defendant MDTA's Opposition to the Motion.

assess the environmental impact of an action before undertaking it.  As with Section 4(f) above, Defendants considered a spectrum of possible environmental harms in 2012 and alternatives to mitigate them, and chose Modified Alternative 7.  Modified Alternative 7 included a separated bike and pedestrian path.  That path was featured as the mitigation basis for Section 4(f), Section 6(f), and NHPA compliance.  The path was what Defendants claimed allowed them to destroy the Historic Nice Bridge.  *Id*. at 10.  A memorandum of agreement, specifically, was executed to ensure that the all-important path be connected directly to existing Section 4(f) and Section 6(f) resources, in further effort to mitigate harm.  *Id*. at Attachment G.  When the path was removed for cost-savings reasons at the time of the 2019 Re-assessment, the harm to Section 4(f), Section 6(f), and historic resources remained, but the mitigating path did not.  *Id*. at Attachment A-4, Table 1.

In addition, neither the 2012 FONSI nor the 2019 Reassessment studied the demolition of the Historic Nice Bridge in the detail sufficient to pass muster under NEPA and the other environmental review Laws.  The 2012 FONSI and Section 4(f) Evaluation indicate that the specifics of demolition would be studied at a later time.  The 2019 NEPA Reassessment focuses on justifying the decision to remove the path from the bridge for cost reasons, but other than saying demolition will occur and providing a list of considerations in an appendix, no demolition plan is studied or considered.  *Id*. at 11-12.  Demolition of one bridge, just like the building of another, is an act involving government funding and permitting that triggers environmental review.

MDTA's rapidly changing position reflects that even today no solid demolition plan has been set—let alone studied for environmental harm using an alternatives analysis as envisioned by NEPA and the Environmental Review Laws.  In the letter attached to the Motion as Exhibit

C, Mr. Ports indicates that the parts of the bridge will be used as a reef, although no environmental study of that potentiality was presented in the TRO/PI materials and may not exist. The Affidavit of Mr. Wolfe (Exhibit F to Defendant's Opposition) makes no reference to a reef.

During a July 28, 2022, MDTA board meeting, MDTA indicated that explosive demolition would be used, MDTA Board Meeting, Maryland Transportation Authority (July 28, 2022, https://vimeo.com/734335594) but then took the position in the October 6, 2022, hearing that no explosives would be used. When MDTA presented its affidavit of Mr. Wolfe in its Opposition to the Motion on Saturday October 8, 2022, Mr. Wolfe indicated that the use of sub-aqueous explosives remained an open question and had not been vetted through any permitting authority. MDTA Oppo. Ex. F. at ¶12.

MDTA's timeline for demolition, likewise, has not been consistent. Their website says beginning of 2023. During an August 31, 2022, exchange between Mr. Ports and Comptroller Peter Franchot during a Board of Public Works meeting, Mr. Ports told Mr. Franchot that MDTA would be meeting with the public throughout the fall about the bridge, including the demolition of the Historic Nice Bridge, suggesting no demolition plan was imminent:

> [Franchot to Ports, requesting a delay in the demolition]: "But you might slowdown just for a couple of weeks and sit down with the locals again and, you know, speak to the citizen groups because there are a lot of them"
>
> [Ports to Franchot]: "As a matter of fact, we have our CTP tours coming up. And we're going out, CTP starts September 15th and goes until November 15th by law. We will be meeting with all the local jurisdictions and would be more than happy to meet with them again."

Transcript of Aug. 30, 2022 Board of Public Works Meeting pp. 22-26 (attached hereto as **Exhibit A**). Nevertheless, in Court on October 6, 2022, MDTA informed the Court, Plaintiffs,

and the public that demolition begins October 13, 2022, necessitating this TRO/PI hearing at breakneck speed. These statements reflect a rapidly changing demolition plan and timeline and demonstrate that MDTA is proceeding with removing the decking on the bridge to prevent any future efforts to repurpose the Historic Nice Bridge without a clear plan in place, without having undertaken appropriate environmental considerations, without having complied with NEPA, and with the expectation that explosives most likely will be needed in the future to remove some of the piers (Pines, July 28, 2022 MDTA board meeting; MDTA Oppo. Ex F at ¶12). The TRO/PI must go into place until Defendants can demonstrate a complete and vetted demolition plan that addresses the Environmental Review Laws, as well as the requisite permitting needed to support the demolition plan.

### 3. Defendants violated Section 6(f).

Section 6(f) prevents the government from taking public lands when those lands were developed using the LWCF. Barnsfield Park was developed using such resources. In their 2012 Evaluation, Defendants acknowledged not only the taking of park resources through direct impact of the bridge, but also the importance of access to such resources. In the 2019 reassessment, Defendants concluded that because the bridge redesign had a smaller footprint, it could be built without taking Section 6(f) property. Defendants then wrote all Section 6(f) considerations out of their 2019 Reassessment and revised memorandum of agreement. Defendants choice to remove all consideration of Section 6(f) based on the need for property acquisition alone misses the point of Section 6(f), which is to ensure quality and public access to LWCF for future generations. By building a bridge without safe crossing for bikes and pedestrians, Defendants harmed access to Section 6(f) property in Virginia regardless of whether the ultimate bridge could be designed to narrowly avoid the actual taking of such lands.

### 4. Defendants Violated Section 106 of the NHPA.

Section 106 of the NHPA requires Defendants to consider "a broad range of alternatives" before undertaking an action that could disrupt historic resources. 36 C.F.R. 800.1(c). Defendants undertook such an analysis in 2012 and selected Modified Alternative 7. Defendants did not conduct any such analysis in 2019 when they stripped away the key components of Modified Alternative 7—the separated biked/pedestrian path and the ten foot shoulders. Having deleted planned mitigation, Defendants nonetheless maintained their plans to demolish identified historic structures. Defendants have not considered the broad range of alternatives to prevent harm to historic structures and have not conducted planning at an early stage where decisions are still being made. 36 C.F.R. 800.1(c). In the 2019 Reassessment, Defendants changed the project to save money, and Defendants worked backward to justify that decision without an alternatives analysis or consideration of appropriate alternatives to mitigate harm to several historic structures—most notably the Historic Nice Bridge itself, which is eligible for listing on the National Register of Historic Places. This self-fulfilling, one-track-minded analysis is not what is envisioned by the NHPA, particularly when the complete demolition of a historic structure is being considered.

### 5. Defendants Violated the Maryland Environmental Policy Act.

MEPA requires Defendants to assess the environmental impact of the project before undertaking it using legislatively allocated resources. Although there are limited reported decisions in Maryland, MEPA acts similarly to NEPA to govern State actions, as more specially set forth in the Complaint and Motion. Here, Defendants never prepared an environmental effects report ("EER"), yet Defendants intend to use State funding both to construct the new bridge and to demolish the old.

MDTA argues that an EER is not required because the 2019 Reassessment qualifies. Even if the 2019 Reassessment (though otherwise flawed for the reasons set forth herein) qualifies as an EER, it only qualifies as to the use of State funds to build the new bridge, not demolish the old Historic Nice Bridge. Defendants have not presented a demolition plan in their 2019 Reassessment or otherwise, and Defendants must prepare an EER before they may use State funds for demolition.

Defendants also argue that MEPA does not apply because MDTA is self-funding the project. This is not accurate. First, MDTA is a State agency and resources allocated to it—whether from toll revenues or otherwise—are allocated by the Maryland legislature. Second, MDTA sought Statewide Transportation Improvement Project ("STIP") money for the new bridge construction and old bridge demolition projects, and use of these funds also require preparation of an EER under MEPA.[4] October 19, 2021 Letter on STIP Funds attached hereto as **Exhibit B**.

6. **Improper Segmentation and Consideration of Cumulative Impact.**

Both the 2012 FONSI and Section 4(f) Evaluation and the 2019 NEPA Re-assessment inappropriately segment the project in a way that fails to address cumulative impact. First, the 2019 NEPA Reassessment greatly reduces the land area considered to only the bridge area, rendering the impact of environmental justice and deforestation practically irrelevant, when the reality of those impacts from the project as a whole is much more significant.

Next, the 2019 Re-assessment avoids specifics about bridge demolition, except for indicating that it will occur. This is both a segmentation problem and a cumulative impact

---

[4] It is further noteworthy that the Maryland legislature requires that STIP money be used for multi-modal transportation (not just cars), making inaccurate MDTA's 2019 Reassessment representation that the new bridge configuration is consistent with other existing plans.

problem. It is a segmentation problem because ultimately no appropriate environmental assessment or environmental impact statement apparently has been undertaken with regard to the specifics of the demolition plan—if there even is a finite demolition plan at this point in time. *See* MDTA Oppo. Ex. F (indicating that various options are still being explored). It is a cumulative impact problem because the analysis ignores the degree to which providing the pedestrian and bike path was a critical part of the decision to justify the destruction of the Historic Nice Bridge and the harm to other protected resource. As mentioned above, the 2019 Re-assessment explains that keeping the old bridge with the new would be expensive and indicates that destroying the Historic Nice Bridge always had been the plan, but the 2019 Re-assessment does not look at these two decisions together (removing the path and destroying the bridge)—cumulatively—to fully assess the complete impact that taking both actions would have on the human and natural environment. Nor does it mention that in the 2012 FONSI and Section 4(f) Evaluation documents, the retention of the Historic Nice bridge is suggested as an alternative option for bicycle and pedestrian use, if a design other than the preferred alternative is chosen that does not include a barrier-separated bike/pedestrian path. Moreover, even the decision to begin mechanical demolition now and deal with permitting for explosive demolition later is an improper segmentation under NEPA and the other Environmental Review Laws.

**7. Defendants Lack Necessary Permits to Destroy the Historic Nice Bridge**

In the Complaint, Plaintiff explains that NEPA performs a permit wrapping function and by skipping parts of the NEPA analysis, Defendants are likely to miss critical sign-offs and permits by important government agencies. That fear is confirmed by the Affidavit of Mr. Wolfe, who states that MDTA has not finalized its demolition plan and lacks the permits it needs to undertake explosive demolition, which MDTA is currently considering. MDTA Oppo. Ex. F

¶12. Demolishing the Historic Nice Bridge, sinking its rubble to create a reef, using explosive demolitions and the other ideas floated by MDTA all require federal permitting that will in themselves trigger environmental review *of the demolition plan*. MDTA's vague concept of how to finish demolition coupled with the acknowledgement that all permits required to complete the work have not even been applied for, almost guarantees that not only are the Environmental Review Laws being broken, but that the federal agency consultation and permitting reviews triggered by an application and NEPA review in the infrastructure project context (e.g. Clean Water Act Section 401 water quality certification; Clean Water Act Section 404 dredge and fill permit; Coastal Zone Management Act consistency determination, etc.) also have not occurred with respect to MDTA's amorphous demolition plan.

Defendants cannot be allowed to begin demolition of the Historic Nice Bridge until they demonstrate to this Court compliance with all laws. Plaintiffs mention various laws as examples not to be vague, but instead to demonstrate that the NEPA analysis folds in far more than mere environmental review—it is the process by which federal agencies communicate in the infrastructure permitting context. Defendants actions and statements about demolition demonstrate near certainty that Defendants propose to begin work without the required permitting in place or environmental review in place. This action must be enjoined by this Court.

> **B. Plaintiffs and Similarly Situated Persons Will Suffer Imminent, Certain, and Irreparable Harm Absent a TRO and PI.**

An irreparable harm is one that cannot be reversed. Destroying a bridge, without question, is an irreparable harm — full stop. *Save the Courthouse Comm. v. Lynn*, 408 F. Supp. 1323, 1343 (S.D.N.Y. 1975) (holding that demolition of a Courthouse was "[u]nquestionably irreparable injury."); *see also Boston Waterfront Residents Ass'n v. Romney*, 343 F.Supp. 89, 91 (D.Mass. 1972) ("[T]he act of demolition is irrevocable. Consideration of alternative plans . . . is

permanently foreclosed once (the structures) have been razed."). Starting by destroying some of the decking mechanically, while possibly knowing that explosives will be needed to complete the demolition over time, is an irreparable harm. To argue that the demolition of a bridge, particularly one eligible for listing on the National Register of Historic Places, is not an irreparable harm is to miss the point of the irreparable harm analysis. Defendants conflate their justifications for their decision to eliminate the bike/pedestrian path and demolish the bridge, which mainly comes down to cost, with whether the harm is irreparable. In making this mistake, Defendants argue that the harm is not irreparable because (i) they provided bicycle access on the new bridge and (albeit bicycles riding among high-speed cars and trucks, and no options for pedestrians at all) and (ii) Plaintiffs waited until the "eleventh-hour" to bring their claim. Aside from Defendants positions being immaterial to the irreparable harm analysis, they are also incorrect, for the reasons that follow.

**1. Defendants Have Not Provided Safe Access for Bikes and Pedestrians.**

Defendants intimate that the harm is not irreparable because new bridge is the functional equivalent of either the 2012 planned bridge or the use of the Historic Nice Bridge for bicycle pedestrian access because the new bridge was designed with certain bicycle safety features.

Although Defendants focus almost exclusively on bicycle features included on the new bridge, pedestrians would be the overwhelming number of users on a repurposed Historic Nice Bridge, just as they would have been on the promised barrier-separated path. The vast majority of users of the bike/pedestrian path on the Woodrow Wilson Bridge, the next closest crossing of the Potomac River 60 miles upstream, are people on foot, who travel to the bridge specifically to walk. In the most recent year for which complete counts were available, 275,000 people either walked or biked across the Wilson bridge, and no new data is available for counts reflecting the

increased use during COVID. *See generally* Aff. of David Brickley in Support of Reply.

Pedestrians will be banned entirely from using the new Nice Bridge, while bicyclists will risk their lives by riding among high speed car and truck traffic (1 in 7, or 14% of the vehicular traffic on the Nice Bridge are trucks). The posted speed limit of 55 mph on the Historic Nice bridge is very dangerous for bicycles, even when it is not being exceeded.

Not only did the State remove the barrier-separated bike/pedestrian path, but it removed the shoulders, meaning that cyclists using the bridge could be pinned between a high speed tractor-trailer on the one side and the side of the bridge on the other. A two-foot "shoulder" is all that prevents a crossing cyclist from serious bodily harm. Understandably, very few bikers will choose to take this risk, making the as-built bridge a *de facto* ban on bicyclists and a *de facto* and *de jure* ban on pedestrians. This, in turn, largely cuts off Charles County from key recreational resources in Virginia. *See generally* Aff. of David Brickley in Support of Reply.

MDTA cites the Hatem Bridge, which crosses the Susquehanna River, as their model for using this bicycles-mixing-with-traffic plan. This already discredited solution was added to a bridge that was built in 1940 but is hardly a model that should be incorporated into a new bridge meant to last for the next 100 years. That solution is discredited and a failure as demonstrated by the fact that the hours when bicycles are legally allowed to risk using the Hatem Bridge have been significantly reduced out of safety concerns since the plan was initiated. The Hatem Bridge crossing is 20% (one-third of a mile) shorter than the Nice Bridge, yet MDTA continues to proffer it as a "safe" solution. It is not, and the plan fails to provide for safe bike passage or any pedestrian access. *See generally* Aff. of David Brickley in Support of Reply.

**2. Plaintiffs' Choice To Use Litigation as a Last Resort Lacks Connection to the Irreparable Harm Analysis.**

Plaintiffs choice to use the Courts as an option of last resort reflects a lack of

communication by Defendants, particularly MDTA, and does not relate to the irreparable harm analysis. MDTA has not been transparent or clear with their materials and statements, and the project continues to change, with the most recent change being in this Court on October 6, 2022. MDTA's 2019 Re-assessment specifically states that it will maintain a website to provide its environmental assessment documents to the public. 2019 NEPA Re-Evaluation at 5. Conspicuously, MDTA has posted on its website both 2012 environmental assessments but did not the 2019 Reassessment on its website. Aff. of David Brickley in Support of Reply. MDTA's website also continues to represent that demolition of the Historic Nice Bridge will not occur until 2023, which is likewise reflected in the 2019 re-assessment. *Id.* The funding for this project also has been in flux. For a year and a half and not until the March 2022, the federal agencies held back the TIFIA loan resource, for reasons Plaintiffs believe (upon information and belief and will seek in discovery) are related to the inadequacy of the bridge plan, including its environmental documents.

To be sure, although Plaintiffs TRO/PI request appears to have come at the "eleventh hour," Defendants had all of the information in their possession and were not actively sharing it with the public, even stating in numerous places including on their website that demolition would not start as soon as October 13, 2022. Moreover, Plaintiffs have no interest in costing the government more money, and indeed wish that the government would spend its resources on the bike/pedestrian path rather than wasting them on demolishing the Historic Nice Bridge.[5] Plaintiffs also asked this Court at this time only to restrain the State from demolishing the Historic Nice Bridge and not to enjoin immediately all funding and permits for these projects,

---

[5] The new bridge is built, and the new bridge can safely open to serve car and truck drivers on October 12, but there is no harm to car and truck drivers (many of whom also walk or ride bikes) by leaving the old bridge in-place, and there is no harm to MDTA in leaving the old bridge in place until a professional/unbiased study on the costs/benefits of repurposing the bridge can be done, potentially saving MDTA the estimated $17 million in demolition costs.

which this Court has the right to do, so the State may move forward with opening the new bridge upon completion. Plaintiff is grateful that it filed this action before MDTA destroyed the Historic Nice Bridge without a clear plan (or documentation), but Plaintiff did not "choose" to wait to bring this action, nor does the timing of Plaintiff's request relate to the question before the Court of whether the harm of destroying the Historic Nice Bridge is irreparable. Indeed, in other cases where Plaintiffs believed that projects were moving forward without adequate permitting or governmental consultation, the Court deemed that this alone constitutes irreparable harm, even when those actions did not involve the immediate, permanent demolition of a historic bridge.

### C. The Balance of Equities and Public Interest Weigh in Favor of the TRO and PI.

Beyond Defendants arguing that the Plaintiff's alleged delay cause the balance of equities and public interest to weigh against issuing the TRO/PI, the only other basis supplied by Defendants are the alleged $21,500 per day in "delay damages" the State may incur under its contract to have the Historic Nice Bridge demolished. Any risk of increased costs, however, are the result of the State's decisions to cut corners and materially alter the infrastructure project without communicating its intentions to the public or undertaking the appropriate analyses. *Puerto Rico Conservation Found. v. Larson*, 797 F. Supp. 1066, 1072 (D.P.R. 1992) ("Initial approval of a contract by an agency cannot be used to circumvent NEPA's mandate."). In addition, these damages are not substantiated nor has the State presented a viable demolition plan against which such "damages" can be compared. The State also has maintained that demolition would begin in 2023, and appears to have moved demolition up as result of this litigation. The State's alleged "delay damages" are unsubstantiated and not a basis for denying the Motion. *See All. for the Wild Rockies v. Marten*, 200 F. Supp. 3d 1110, 1112 (D. Mont. 2016) ("The balance

of equities tips in favor of Alliance because it faces permanent damage if logging activity were to proceed and the Forest Service faces only delay.").

On balance, there is no comparison between the harm caused by maintaining the status quo (leaving the bridge intact) versus demolishing the bridge (something which there is no coming back from and that lacks any meaningful environmental review). MDTA, can still open the new bridge months ahead of the promised schedule of early 2023, send their contractors home, and possibly save some of the $17 million, or more, in monies budgeted for demolition, monies which could be held in escrow until any future studies of repurposing can be completed. Ultimately, Plaintiffs seek an order maintaining the status quo to permit for required and necessary environmental review, Defendants seek to foreclose any possibility that the Historic Nice Bridge remains or that their permitting and environmental review law compliance ever be meaningfully reviewed. *See Colorado Wild Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1223 (D. Colo. 2007) ("The public has an undeniable interest in the [government's] compliance with NEPA's environmental review requirements and in the informed decision-making that NEPA is designed to promote.").

### D. The Bond Waiver Is Justified

The State requests that a substantial bond be required to offset what the State characterizes as "delay damages" in the amount of $21,500 per day for it being unable to proceed with demolition. "The determination of the precise amount to be posted as a bond, however, rests in the Court's discretion." *Brightview Group, LP v. Teeters*, 441 F. Supp. 3d 115, 144 (D. Md. 2020). "Where the district court determines that the risk of harm is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly. In some circumstances, a nominal bond may suffice." *Hoechst Diafoil Co. v. Nan Ya Plastics*

*Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999).

Here circumstances warrant the Court either waiving the bond requirement altogether or setting a nominal bond. First, when a party is seeking to vindicate the public interest served by NEPA, a minimal or nominal bond amount is appropriate. *See, e.g., Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016); *Friends of the Earth, Inc. v. Brinegar,* 518 F.2d 322, 322–23 (9th Cir.1975); *Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002) (directing the district court to determine the bond, but stating that, "[o]rdinarily, where a party is seeking to vindicate the public interest served by NEPA, a minimal bond amount should be considered"); *Monarch Chem. Works, Inc. v. Exon*, 452 F.Supp. 493, 503 (D. Neb. 1978), *aff'd*, 604 F.2d 1083 (8th Cir. 1979) (setting a bond of $10,000 in a NEPA case, based on the district court's recognition that the plaintiff had the ability to pay and that "private enforcement of environmental duties would be hindered if more than a nominal bond were required"); *Landwatch v. Connaughton*, 905 F.Supp.2d 1192, 1198 (D. Or. 2012) (requiring no bond, based on public interest and the potential chilling effect of requiring one).

Second, a bond requirement should be waived or nominal when the security requested "would effectively deny access to judicial review." *See Colorado Wild*, 523 F. Supp. 2d at 1230–31 (not requiring the posting of a bond when Plaintiffs could not proceed if a bond was set and requested injunction sought to enforce policies and requirements under NEPA). Here, Plaintiffs are non-profit organizations without access to the funds that State asserts would be an appropriate measure of security. Setting a bond, especially for such a substantial amount, would deny Plaintiffs access to justice and meaningful review of Defendants compliance with Environmental Review Laws and other the permitting requirements embedded therein.. *See*

Affidavit of David Brickley in Support of Reply.

## CONCLUSION

For the reasons stated here and in their Motion for Temporary Restraining Order and Preliminary Injunction and Verified Complaint, Plaintiffs respectfully request that this Honorable Court enter an Order granting temporary and preliminary injunctive relief as set forth in the Motion.

Dated: <u>October 10, 2022</u>

Respectfully submitted,

*/s/ Thomas K. Prevas*
Thomas K. Prevas (Bar No. 29452)
Gregory L. Waterworth (Bar No. 20938)
Anamika R. Moore (Bar No. 21689)
**SAUL EWING ARNSTEIN & LEHR, LLP**
1001 Fleet Street – 9th Floor
Baltimore, Maryland 21202
(410) 332-8683 (telephone)
(410) 332-8785 (facsimile)
thomas.prevas@saul.com
anamika.moore@saul.com

***Counsel for Plaintiffs Potomac Heritage Trail Association, Inc. and Dahlgren Railroad Heritage Trail. Inc.***

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this 10th day of October, 2022, a copy of the foregoing Reply to Opposition to Motion for Temporary Restraining Order was served via the Court's CM/ECF system to all parties of record.

/s/ Anamika R. Moore
Anamika R. Moore
