**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

POTOMAC HERITAGE TRAIL              *
   ASSOCIATION, INC., *et al.*,

                                 *

   **Plaintiffs**

                                 *      **Civ. No. DLB-22-2482**

v.

                                 *

UNITED STATES DEPARTMENT            *
   OF TRANSPORTATION, *et al.*,

                                 *

   **Defendants.**               *

**MEMORANDUM OPINION**

On September 28, 2022, plaintiffs Potomac Heritage Trail Association, Inc., Dahlgren

Railroad Heritage Trail, Inc., and Oxon Road Bicycle and Trail Club, Inc. filed a complaint seeking

declaratory and injunctive relief against the United States Department of Transportation ("DOT"),

the Federal Highway Administration ("FHWA"), the Maryland Department of Transportation

("MDOT"), and the Maryland Transportation Authority ("MDTA"), as well as their officers.  The

plaintiffs simultaneously filed a motion for a temporary restraining order and preliminary

injunction asking the Court to enjoin the defendants from demolishing the Governor Harry M.

Nice Memorial Bridge (the "Historic Nice Bridge").  Built in 1940, the 80-year-old Historic Nice

Bridge spans the Potomac River between King George County, Virginia and Charles County,

Maryland.[1]  The narrow two-lane bridge has no median or shoulder, and only vehicles may cross

it.  Cyclists and pedestrians are prohibited.

The Historic Nice Bridge has been replaced with a new bridge (the "new bridge" or the

"as-built bridge") that fully opens for public use on Thursday, October 13, 2022.  The replacement

---

[1] In 2018, the bridge was renamed the Governor Harry W. Nice Memorial/Senator Thomas "Mac"
Middleton Bridge.

of the Historic Nice Bridge has been in the works for over a decade.  An initial design for the new bridge was selected in 2012.  The selected design included a dedicated bicycle/pedestrian ("bike/ped") path separated from the vehicular traffic by a barrier.  In 2019, the bridge design changed and did not include a separated bike/ped lane.  The new design—which is the design for the as-built bridge—has four twelve-foot lanes, including one lane in each direction that cyclists may share with vehicles, a two-foot wide median, and two-foot wide inside and outside shoulders on either side.  Demolition of the old bridge is scheduled to commence immediately after the new bridge opens.

The plaintiffs oppose the demolition of the Historic Nice Bridge because the new bridge does not have a separated path for cyclists and pedestrians, as contemplated by the original 2012 design, and they view the Historic Nice Bridge as the only remaining viable option for safe bike and pedestrian passage over the Potomac River.  They allege that the defendants have violated various federal and state laws by failing to consider the impact of demolishing the Historic Nice Bridge without including a separated bike/ped lane on the new bridge.  As a remedy for these alleged violations, they ask the Court to stop the imminent demolition of the Historic Nice Bridge. The plaintiffs have known for years that the as-built bridge would not have a dedicated bike/ped lane and that the old bridge would be demolished after the new bridge was built, yet they did not seek Court intervention until two weeks ago.  For the reasons stated below, their request to enjoin the demolition of the Historic Nice Bridge is denied.

## I.     Factual Background

### A.     Needed Improvements to the Historic Nice Bridge

The Historic Nice Bridge is a 1.7-mile-long bridge along US 301, connecting Maryland and Virginia over the Potomac River.  ECF 1-1, at 7.  Cyclists and pedestrians are not allowed on

the bridge, and the accommodations for them on approach roadways are limited. *Id.* The approaches to the bridge consist of two travel lanes in each direction and outside shoulders, but the bridge itself has only one travel lane in each direction with no median separation. *Id.* This bottleneck has several implications. The bridge currently does not meet National Highway System and Strategic Highway Network design standards, which require that the cross section of approach roadways be carried across the bridge. *Id.* Traffic accumulates on weekends and major holiday weekends. *Id.* The most frequent type of reported crash is opposite direction crashes, attributed to the lack of a median. *Id.*

At 80 years old, the Historic Nice Bridge requires regular maintenance. Over the past 10 years, MDTA spent an average of $313,376 annually for routine upkeep (reaching as much as $1.5 million depending on the year). ECF 1-5, at 3. The bridge is now estimated to require over $800,000 annually to maintain, not including "major rehabilitation activities" that likely will be required as the bridge further ages. *Id.*

In 2006, MDTA began planning for improvements to the Historic Nice Bridge. ECF 29-1, at 3, *Combined Purpose and Need & Alternates Retained for Detailed Study Package* ("Combined Purpose Package") (2008). According to the 2008 Combined Purpose Package:

> The purpose of the Nice Bridge Improvement Project is to: provide a crossing of the Potomac River that is geometrically compatible with the US 301 approach roadways; provide sufficient capacity to carry vehicular traffic on US 301 across the Potomac River in the design year 2030; improve traffic safety on US 301 at the approaches to the Potomac River crossing and on the bridge itself; and provide the ability to maintain two-way traffic flow along US 301 during wide-load crossings, incidents, poor weather conditions, and when performing bridge maintenance and rehabilitation work.

*Id.* The Combined Purpose Package considered 13 alternates, as well as a "No-Build Alternate" that would rehabilitate the Historic Nice Bridge. *Id.* These proposals were presented at public workshops in Maryland and Virginia on May 31, 2007 and June 7, 2007. *Id.* Members of the

public and other state agencies asked MDTA to include bicycle and pedestrian facilities in the bridge improvement analysis. *Id.* Seven alternates were retained for detailed study, including four that replaced the old bridge or removed it from service, as well as the "No-Build" plan. *Id.* at 5–6.

**B.     The 2009 Environmental Assessment**

In 2009, MDTA published an Environmental Assessment ("EA") and Draft Section 4(f) Evaluation for improvements to the Historic Nice Bridge that analyzed the seven retained alternate plans. *See* ECF 29-2, at 6, *Environmental Assessment/Draft Section 4(f) Evaluation* ("2009 EA/Draft 4(f) Evaluation") (July 30, 2009). The 2009 EA/Draft 4(f) Evaluation reiterated that the same purposes of the project. *Id.* at 5. The 2009 EA/Draft 4(f) Evaluation also noted that "[p]er Maryland Senate Bill 492, each of the build alternates includes a barrier-separated bicycle/pedestrian path (bike/ped path) option. This option was incorporated per Senate Bill 492 and requests from members of the public." *Id.* "Each alternate (including the No-Build) was analyzed for natural, socioeconomic, noise, air, and cost impacts." *Id.* For all alternates, the bike/ped path option added to the overall construction and maintenance cost and increased some of the environmental impact measures assessed, particularly the water and floodplain assessments. *See, e.g.*, *id.* at 41, 70, 75. Public hearings on the project were held on September 17, 2009 and September 24, 2009. ECF 9-3, at 33, *Finding of No Significant Impact* (Oct. 2012). At some point prior to October 2012, FHWA and MDTA independently evaluated the 2009 EA/Draft Section 4(f) Evaluation. *Id.* at 5.

**C.     The 2012 Section 4(f) Evaluation and Finding of No Significant Impact**

In October 2012, FHWA and MDTA issued a Finding of No Significant Impact ("FONSI") and Final Section 4(f) Evaluation. *See* ECF 9-2; ECF 9-3. Both reports analyze the MDTA

4

Preferred Alternate, a modified version of Alternate 7 from the 2009 EA/Draft Section 4(f) Evaluation.  ECF 9-2, at 11; ECF 9-3, at 11.  Modified Alternate 7 would build a new, four-lane bridge to the north of the old bridge with a separated two-way path for cyclists and pedestrians on one side of the bridge.  ECF 9-2, at 6–7; ECF 9-3, at 11–12.  It would also demolish the Historic Nice Bridge following the opening of the new bridge.  *Id.*

The FONSI determined that the Modified Alternative 7 would have no significant impact on the environment. ECF 9-3, at 5.  The report further determined that it and the 2009 EA "adequately and accurately discuss the need, environmental issues, and impacts of the proposed project and appropriate mitigation measures" and provide "sufficient evidence and analysis" to conclude that an Environmental Impact Statement ("EIS") was not required.  *Id.* at 5–6.  The Final Section 4(f) Evaluation considered the Modified Alternative 7's proposed use of land from publicly owned parks, recreation areas, wildlife and waterfowl refuges, and significant historic sites. ECF 9-2, at 6.  It identified four affected Section 4(f) properties within the project area: the Historic Nice Bridge (including the Potomac River Bridge Administration Building); Barnesfield Park; Dahlgren Wayside Park; and Potomac Gateway Welcome Center.  *Id.* at 17.  It determined that there were "no feasible and prudent alternatives to the use of Section 4(f) properties, and that Modified Alternate 7 include[d] all possible planning to minimize harm resulting from the use of these properties."  *Id.* at 6.  It also provided notification that the use of the Section 4(f) properties, including mitigation measures, would have a *de minimis* impact.  *Id.*

The FONSI also considered how demolition of the Historic Nice Bridge could be accomplished while mitigating adverse impacts.  It stated that "releases of sediment from land-disturbing activities will be minimized through erosion and sediment controls," through plans that would be submitted for approval as part of obtaining National Pollutant Discharge Elimination

System Permits.  *Id.* at 23.  To minimize adverse impacts on wildlife, it described the specific ways the project would coordinate with National Marine Fisheries Service ("NMFS").  *See id.* at 24 ("[A]dditional coordination will be undertaken" to discuss conservation recommendations to mitigate effects of subaqueous blasting on anadromous fish); *id.* at 27 ("[D]iscussions with NMFS on construction methodology and time-of-year restrictions will limit the impact to rare, threatened, and endangered species, and therefore will not rise to the level of significant"); *id.* at 38 (requiring that construction activities, including blasting, comply with protection guidelines for bald eagles).

FHWA approved the FONSI in November 2012.  ECF 9-3, at 6.

### D.    The 2019 Re-Evaluation

In 2015, MDTA evaluated performance-based practical design strategies for the project, resulting in a "modified design configuration that meets the objectives of the project Purpose and Need and achieves significant project savings."  ECF 28-3, at 15.  These savings in turn "made this project financially viable for construction sooner, providing safety and congestion relief that is needed now."  *Id.*  The main changes reduced the width of the bridge's shoulders, added a bid-alternate approach to consider a bike/ped path option, and modified the navigational channel to reduce the bridge's length.  *Id.*  Under the new design, the bridge would have four twelve-foot lanes, including a shared bike lane in each direction; a two-foot wide median; and two-foot wide inside and outside shoulders on either side.  *Id.* at 10.  It no longer included a barrier-separated bike/ped path.  *Id.*

In February 2019, MDTA submitted to FHWA a re-evaluation under the National Environmental Policy Act ("Re-evaluation") to determine if, in light of the current updated bridge design, the 2012 FONSI and Final Section 4(f) Evaluation remained valid.  *Id.* at 3; *see also* 23

C.F.R. § 771.129.[2]  The Re-evaluation included an analysis of the current design as compared with

the 2012 FONSI Selected Alternative (Modified Alternative 7).  ECF 28-3, at 10.  It built into this

assessment an option for the current design with a bid item for a separated bike/ped option.  *Id.*

For the purposes of evaluating environmental impacts, the Re-evaluation explained it "uses the

larger footprint associated with the Current Design with Path Option to fully assess impacts

imparted by the wider footprint," as opposed to the "more conservative" impacts of the current

design without the separated path.  *Id.*

    With that framing, the Re-evaluation included, *inter alia*, an evaluation of the

environmental impact of the project (*id.* at 25); analysis of the socioeconomic resources and land

use at issue (*id.* at 26–29); consideration of environmental justice factors (*id.* at 29–30); review of

potentially impacted cultural and historic resources, including the existing bridge (*id.* at 34–35);

analysis of potential harm to rare, threatened, or endangered species and critical habitats, including

harm from blasting (*id.* at 38–42); noise and air quality evaluations (*id.* at 44–47); an updated

Section 4(f) evaluation (*id.* at 51–55); mitigation efforts, including mitigation requirements for

blasting and limitations on sub-aqueous blasting (*id.* at 58–77); a summary of coordination with

other agencies (*id.* at 109, Attachment C); an environmental impact summary table (*id.* at 305,

Attachment E); supporting Section 4(f) documentation, including a memorandum of agreement

regarding mitigation effects to public parks (*id.* at 309, Attachment G); and a letter of concurrence

from the United States National Oceanic and Atmospheric Administration agreeing that the

---

[2] The plaintiffs admitted at today's hearing that they first learned about the Re-evaluation when the defendants attached it to their opposition to the motion for a preliminary injunction.  They claim it was never publicly available on the MDTA website and could not be located on the Internet.  The defendants indicated the document was not posted on the Internet but was available through a Freedom of Information Act or informal request.

proposed action was not likely to adversely affect any Endangered Species Act species or critical habit (*id.* at 339, Attachment H).

Regarding the options for bicycle access, the Re-evaluation explained that "[b]icycle access is currently prohibited on the Nice Bridge, and this prohibition will be lifted on the new bridge." *Id.* at 21. It described why using the existing bridge as a dedicated bike/ped path is neither feasible nor prudent. *Id.* at 13. ("To use the existing bridge as a trail will require significant long-term maintenance investments, installation of new pedestrian and bicycle safety features, providing additional environmental impact mitigation measures, and restricts operations to provide a more cost-effective navigational passage. These make it cost prohibitive . . . . [N]o entity has expressed a willingness to assume the ownership."). The Re-evaluation also stated, "MDTA recognizes and appreciates the regional importance of bicycle access and will accommodate bicycles on the New Nice Bridge . . . with a separate path or shared-lanes. Both of these alternates have been safely used in other locations throughout Maryland . . . Signage and lane control signals may be utilized to improve safety of cyclists if using a shared lane option." *Id*. at 12. It indicated that "[t]he MDTA Board will evaluate the design/build proposals and determine provisions for a separated path on a cost-benefit basis." *Id.* It noted that "nonmotorized user volumes are anticipated to remain low." *Id.* Attached to the Re-evaluation was a Practical Design Report that analyzed various alternative designs to achieve the stated purposes of the project for a reduced cost. *Id.* at 90, Attachment A. The Practical Design Report also compared the proposed designs and predicted bicycle and pedestrian usage relative to other existing bridges, such as the Francis Scott Key Bridge and the Woodrow Wilson Bridge. *Id.* at 98–102. Based on this comparison, the Practical Design Report concluded that the cost of adding a separate bike path to the new bridge

was approximately $59.1 million (7.69% of the total project cost), despite the estimated bicycle and pedestrian usage being only 0.25% of the total traffic expected.  *Id.* at 102.

On July 24, 2019, these two options were discussed at a public Transportation Planning Board meeting.  ECF 29-4, at 7.  MDOT stated that during a prior meeting, they had conveyed that a barrier-separated lane is "one of the proposed design options," but that MDOT "cannot guarantee that the final design will include barrier-separated facilities."  *Id.*  In response, the Transportation Planning Board voted to require that MDOT report back to the Planning Board in December 2019 once a decision about the separated bike lane had been made.  *Id.* at 8.  The representative from MDOT agreed to do so and explained that the "process is a bid alternative, [with] two proposals, one with a separated lane, to consider."  *Id.*  On December 18, 2019, MDOT reported to the Transportation Planning Board that it had selected the option without a separated bike/ped path.  *See* ECF 29-5.  The presentation stated that the separated path added over $70 million to the project's projected costs.  *Id.* at 5.  It estimated that, based on expected usage, the construction cost per average daily path-user would be $1.3 million.  *Id.* at 8.

### E.     The New Bridge

Construction began on the new bridge in 2020.  ECF 1, ¶ 84.  On July 14, 2022, Senators Cardin and Van Hollen and Congressman Hoyer sent a letter to Jim Ports, Chairman of MDTA, urging the State to "reconsider plans to demolish the old bridge, and halt any immediate efforts to do so."  ECF 1-4, at 2.  The Congressmen requested that MDTA allow time for an independent study of the feasibility, costs, and benefits of converting the old bridge to a non-motorized trail, especially if a new EA was necessary to study the use of explosives during demolition.  *Id.*  Mr. Ports replied on July 21, stating that MDTA would "continue with the permitted plan to demolish the existing bridge and use the demolition materials for enhancing artificial reef habitat."  ECF 1-

5, at 4.  MDTA estimated $46.7 million in 2015 dollars would be needed to maintain the existing

bridge for bicycle and pedestrian use for 30 years.  *Id.* at 1.  Charles County, King George County,

and the Commonwealth of Virginia each had requested information about options to retain the

existing bridge, and MDTA offered to transfer ownership, but they declined due to prohibitive

facility maintenance costs.  *Id.* at 1–2.  Virginia, for instance, independently estimated the upfront

costs to retain the bridge would be between $9.3 to $10 million, plus over $800,000 annually.  *Id.*

at 2.  Mr. Ports also explained that the Historic Nice Bridge could not be converted.  He stated that

MDTA

> performed scour analysis to determine the impact on the new bridge foundations
> from leaving the existing bridge piers in place.  The results of these analyses, which
> were presented to the participating federal agencies, concluded that leaving the
> existing bridge foundations is a safety threat to the new bridge based on FWHA
> guidelines for evaluating scour at bridges.  Based on this finding, leaving the
> existing bridge foundations in place is not an option. . . . Maintaining the 80-year-
> old existing Nice/Middleton Bridge is <u>not</u> an option.

*Id.* at 4.

The new bridge is scheduled to fully open to the public on Thursday, October 13, 2022.

ECF 29-6, ¶ 5.  Demolition is slated to begin in earnest immediately after the new bridge opens.

According to the defendants, the estimated cost per day of delaying demolition is $21,533.  *Id.* ¶ 8.

The current plan is for the initial demolition stage to be done mechanically, followed by above-

water blasting several months later.  *Id.* ¶¶ 9–10.  They are also considering, in consultation with

federal agencies, the use of sub-aqueous explosives in later stages of demolition.  As of the date

of this opinion, they have not obtained permits for the use of sub-aqueous explosives.  ECF 29-6,

¶ 12.

### F.      The Plaintiffs' Lawsuit and Request for Injunctive Relief

Potomac Heritage Trail Association, Inc. and Dahlgren Railroad Heritage Trail, Inc. are Virginia not-for-profit corporations whose primary purpose is to protect, promote, and improve the Potomac Heritage National Scenic Trail and the Dahlgren Railroad Heritage Trail, respectively.  ECF 1, at ¶¶ 29, 30.  The Potomac Heritage Trail is adjacent to the Historic Nice Bridge on both sides of the Potomac River; this noncontiguous trail does not cross the bridge.  *Id.* ¶ 30.  The Dahlgren Railroad Heritage Trail is a 16-mile trail that ends just short of the bridge on its Virginia side.  *Id.* ¶ 32.  Oxon Road Bicycle and Trail Club, Inc. is a 50-year-old Maryland not-for-profit corporation with more than 400 members and a significant minority membership population.  *Id.* ¶ 34.  Its primary purpose is to provide more and better cycling options as a means of recreation and carbonless transportation in Southern Maryland.  *Id.*

The plaintiffs challenge the defendants' decision to build a new bridge without a separated bike/ped lane while demolishing the Historic Nice Bridge.  Specifically, they assert violations of Section 4(f) of the Department of Transportation Act of 1966; Section 6(f) of the Land and Water Conservation Fund Act of 1965; the National Environmental Policy Act; the National Historic Preservation Act; and the Maryland Environmental Policy Act (collectively, the "Environmental Review Laws").  ECF 1, at  ¶ 3.  The plaintiffs essentially argue that studying and selecting one bridge configuration and then building another bridge configuration that allegedly was not subject to study violates the Environmental Review Laws.  *Id.* ¶ 12.  They claim the new bridge does not allow for a safe Maryland–Virginia connection for cyclists and pedestrians who want to access the historic trails on both sides of the bridge.  *Id.* ¶ 37.  They argue that local communities, particularly minority communities in Charles County, need a dedicated bike/ped path for recreational access to Section 4(f) and Section 6(f) resources in Virginia.  *Id.* ¶  15.  If the Historic Nice Bridge is

11

demolished, the plaintiffs claim they will be irreparably harmed because the bridge "could be the last opportunity to ensure safe crossing [of the Potomac River] and access to recreational resources at reasonable cost." *Id.* ¶ 38.  They seek various forms of declaratory and injunctive relief.  *See id.* ¶ 142.  Most pressingly, they seek a temporary restraining order and preliminary injunction to stop the defendants from demolishing the Historic Nice Bridge.  *See* ECF 9.  The defendants oppose the request for an injunction.  ECF 28 (opposition of DOT and FHWA) & ECF 29 (opposition of MDTA and MDOT).  The plaintiffs submitted a reply.  ECF 31.

> ### G.     The Hearing on the Preliminary Injunction Motion

At today's hearing on the motion for a preliminary injunction, the Court heard testimony from David Brickley, the President of Dahlgren Railroad Heritage Trail, Inc., who testified on behalf of the plaintiffs, and Brian Wolfe, Director of Project Development at MDTA and project manager of the Nice bridge improvement project.[3]  Through Mr. Wolfe, the defendants introduced several exhibits, including bridge demolition plans submitted to various permitting authorities and a July 2020 Hydrologic & Hydraulic Analysis and Bridge Scour Analysis Report for the new bridge.

## II.     Standard for Preliminary Injunctive Relief

Prior to the entry of a final judgment, a court may enter a preliminary injunction.  Fed. R. Civ. P. 65(a).  Such an injunction "protect[s] the status quo and . . . prevent[s] irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits."  *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)).  A preliminary

---

[3] Due to the press of time and the need to issue quickly a written decision on a matter of public importance, the Court was unable to obtain a transcript of the hearing and incorporates witness testimony into the analysis, where appropriate, without citations.

injunction enables the Court to ensure that, if the plaintiff prevails, the relief sought will be available to the same extent as when it filed suit. *See id.* "A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief' and may never be awarded 'as of right.'" *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008)); *see also Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (en banc).

A plaintiff seeking preliminary injunctive relief bears the burden of proof and must meet "a high bar" by "[s]atisfying . . . four factors." *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 385 (4th Cir. 2017); *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). The plaintiff must clearly show "[1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20; *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009), *vacated on other grounds, Citizens United v. FEC*, 558 U.S. 310 (2010), *aff'd, The Real Truth About Obama, Inc. v. FEC*, 607 F.3d 355 (4th Cir. 2010) (per curiam) (discussing *Winter* factors). Each factor must be "satisfied as articulated." *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013) (quoting *The Real Truth*, 575 F.3d at 347).[4]

---

[4] The plaintiffs also requested a temporary restraining order. A TRO is distinguished from a preliminary injunction only by the duration of the relief it provides and the notice that must be given to the nonmoving party. *U.S. Dep't of Lab. v. Wolf Run Mining Co.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006) (comparing Fed. R. Civ. P. 65(a) and 65(b)). "While a preliminary injunction preserves the status quo pending a final trial on the merits, a [TRO] is intended to preserve the status quo only until a preliminary injunction hearing can be held[.]" *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999). The standard for granting a TRO "is the same as for granting a preliminary injunction." *Montgomery v. Hous. Auth.*, 731 F. Supp. 2d 439,

### III.    Discussion

### A.    Likelihood of Success on the Merits

To obtain preliminary injunctive relief, the plaintiffs must "make a 'clear showing' that [it is] likely to succeed at trial, but it need not show a certainty of success." *Pashby*, 709 F.3d at 321 (internal citations omitted).  They have not met this burden.

This Court "may hold unlawful and set aside a federal agency action for certain specified reasons, including whenever the challenged act is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Wild Va. v. U.S. Forest Serv.*, --- F.4th ----, 2022 WL 215125, at *6 (4th Cir. Jan. 25, 2022) (quoting *Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582, 589–90 (4th Cir. 2018) (alteration and internal quotation marks omitted)); 5 U.S.C. § 706(2)(A).  In undertaking that analysis, the Court must "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Ctr. for Sci. in the Pub. Int. v. Perdue*, 438 F. Supp. 3d 546, 557 (D. Md. 2020).  Review under the APA is "highly deferential" to the agency.  *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1115 (4th Cir. 2014).  "[Y]et the arbitrary-and-capricious standard does not reduce judicial review to a rubber stamp of agency action." *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012).  "In the end, 'if the agency has followed proper procedures, and if there is a rational basis for its decision, [this Court] will not disturb its judgment." *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 422 (4th Cir. 2012) (quoting *Hodges v. Abraham*, 300 F.3d 432, 445 (4th Cir. 2002)) (internal alterations omitted).

---

441 (D. Md. 2010).  Because the Court has held a hearing on the preliminary injunction motion, the motion for a TRO is denied as moot.

### 1.   Section 4(f) of the Department of Transportation Act of 1966

The Department of Transportation Act of 1966 establishes that "special effort should be made to preserve the natural beauty of . . . public park and recreation lands, wildlife and waterfowl refuges, and historic sites" in the United States.  49 U.S.C. § 303(a).  To that end, Section 4(f) imposes certain restrictions on the use of such land for transportation purposes when the land is of local, state, or national significance.  49 U.S.C. § 303(c).  Section 4(f) "use" of land occurs either when the land itself is incorporated into a transportation project or when the land is "constructively" used.  23 C.F.R. § 774.15(a); *id*. § 771.135(p)(2).  Constructive use occurs when "the transportation project does not incorporate land from a Section 4(f) property, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify the property for protection under section 4(f) are substantially impaired."  *Id*.  One such situation in which constructive use occurs is when "the project results in a restriction on access which substantially diminishes the utility of a significant publicly owned park, recreation area, or historic site."  23 C.F.R. § 771.135(p)(4)(iii).

Under Section 4(f), the Secretary of Transportation may approve a program or project requiring the use or constructive use of covered land in only two scenarios.  First, the Secretary may approve programs or projects that would have a *de minimis* impact on the area.  49 U.S.C. § 303(d); 23 C.F.R. § 774.3(b).  Second, if the impact is more than *de minimis*, the Secretary may approve the project "only if—(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use."  49 U.S.C. § 303(c); 23 C.F.R. § 774.3(a)*.*  An alternative is feasible unless "as a matter of sound engineering" it should not be built.  *Hickory Neighborhood Defense League v. Skinner*, 893 F.2d 58, 61 (4th

Cir. 1990).  Whether an alternative is prudent requires the Secretary to consider disruption to the community and the inherent value of the property.  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 412–13 (1971).  Land protected under Section 4(f) may not be used unless there are "truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes."  *Id.*; *Hickory Neighborhood Defense League*, 893 F.2d at 61.  The alternative routes must present unique problems.  *Id.*

If a project changes after an environmental analysis (including a FONSI), another Section 4(f) approval is required when

> [a] proposed modification of the alignment, design, or measures to minimize harm (after the original section 4(f) approval) would result in a substantial increase in the amount of section 4(f) property used, a substantial increase in the adverse impacts to section 4(f) property, or a substantial reduction in mitigation measures.

23 C.F.R. § 771.135(m).  If the Secretary determines under § 771.135(m) that another Section 4(f) analysis is required, the new evaluation need not necessarily include a new or supplemental environmental document.  *Id.* § 771.135(n).  The new evaluation also need not prevent the granting of new approvals, require the withdrawal of previous approvals, or require the suspension of project activities that are not affected by the Section 4(f) evaluation.  *Id.*

When reviewing Section 4(f) approvals, courts take a "hard look" at whether the facts supported the Secretary's decision that there were no feasible and prudent alternatives.  *Hickory Neighborhood Defense League*, 893 F.2d at 61 (citation omitted).  Specifically, courts consider three factors:

> First, the court must determine whether the Secretary acted within the scope of his authority.  In making this determination, the court must find that the Secretary could have reasonably believed that there were no feasible and prudent alternatives.  Second, the court must determine that the Secretary's decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  In deciding whether the decision was arbitrary or capricious, "the court must consider whether the decision was based on a consideration of the relevant factors

16

and whether there has been a clear error of judgment." However, the reviewing court may not "substitute its judgment for that of the agency." The final factor to consider is whether the Secretary followed all procedural requirements.

*Id.* (citing *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 415–17).

The plaintiffs do not dispute the validity of the 2012 Final Section 4(f) Evaluation nor its reliance on the 2012 Environmental Assessment and FONSI prepared under NEPA. *See* ECF 1, at 5-6; 17–19. Instead, they challenge the defendants' alleged failure to perform another Section 4(f) analysis when the plans changed from Modified Alternative 7 to the as-built bridge. *Id.* ¶¶ 5–6 ("No documentation exists demonstrating that all possible planning was conducted to minimize harm caused by [the new bridge plan] . . . . No documentation exists to demonstrate that the new bridge plan assessed all feasible and prudent alternatives . . . . No re-assessment has occurred relating to the As Built bridge . . . . The As Built Bridge lacks the required Section 4(f) evaluations." ). The record does not support the plaintiffs' assertions.

In 2019, when the MDTA decided to change the design of the new bridge and proposed a new design, the defendants conducted a re-evaluation under NEPA to determine whether the 2012 FONSI/Final Section 4(f) Evaluation remained valid in light of design changes. The Re-evaluation compared the effects of the original design on four impacted Section 4(f) resources with the effects of the new design (including with a separated bike/ped path option) on the same Section 4(f) resources. The impact on the Historic Nice Bridge remained the same; it would be demolished under both designs. The new design with a separated bike/ped path option would reduce impact on Barnesfield Park and the Potomac Gateway Welcome Center / Dahlgren Heritage Museum. Only the impact on Dahlgren Wayside Park would increase under the new design and by only 0.47 acres. This impact increase was *de minimis*, as it "would not adversely impact the activities, features and attributes of [Dahlgren Wayside Park]." *Id.* at 64. The Re-evaluation states that the

park's owner, King George County, agreed the impact was *de minimis* and that public notice was provided regarding this change in impact but no comments were received.  Finally, attached to the 79-page Re-evaluation is a 2018 amended Memorandum of Agreement between state and federal authorities (including MDTA and FHWA) in which they recommit to Section 4(f) mitigation for any replacement property sites under the new design.

On this administrative record, the Secretary could reasonably have believed there were no feasible or prudent alternatives to the new design.  The new design *decreased* impact to two of four Section 4(f) resources.  Impact remained the same with respect to the Historic Nice Bridge, which was slated for demolition under both the 2012 FONSI Selected Alternative and the new design options.  Because the impact on these three properties either remained the same or decreased, the Re-evaluation appropriately incorporated its original 2012 Final Section 4(f) Evaluation and mitigation measures.  ECF 28-3, at 64.  According to the 2012 Final Section 4(f) Evaluation, five alternates that would have avoided Section 4(f) properties were considered but none would be feasible or prudent.  ECF 1-1, at 30.  The evaluation further showed how Modified Alternative 7, of the remaining alternates, caused the least overall harm to Section 4(f) properties. *Id.* at 40.  The plaintiffs have not argued that the 2012 Section 4(f) findings or mitigation measures were invalid (and, indeed, cite to them in the complaint).  *See* ECF 1, at 36.  Regarding the new design's increased impact on Dahlgren Wayside Park, the Re-evaluation documents why this impact is considered *de minimis*—a far cry from the "substantial increase in the amount of section 4(f) property used, a substantial increase in the adverse impacts to section 4(f) property, or a substantial reduction in mitigation measures" that would have triggered a new analysis in the first place.  23 C.F.R. § 771.135(m).  In sum, the defendants undertook an analysis of the new design

that, like the 2012 analysis, thoroughly assessed relevant factors.  There is no indication on the current record that there was any clear error of judgment or failure to follow proper procedure.[5]

The plaintiffs argue that the new bridge and the absence of a separated bike/ped path to cross the river harms Section 4(f) properties by reducing the number of cyclists and pedestrians who may access them via a bridge.  This reduction in access to Section 4(f) properties—which the plaintiffs call a "constructive harm" to the properties—will occur because the new bridge prohibits pedestrians altogether, its shared bike lanes are dangerous and will deter most cyclists from crossing the bridge to reach Section 4(f) properties, and there is no other bridge option for cyclists and pedestrians.  The plaintiffs suggest that a separated bike/ped lane, which was contemplated in the initial design and approved in the 2012 FONSI and Final Section 4(f) Evaluation, mitigated this constructive harm to Section 4(f) and 6(f) parks and resources in Virginia.   This argument is likely to fail.

While the plaintiffs are correct that loss of access can be a constructive harm to Section 4(f) property, *see* 23 C.F.R. § 771.135(p)(4)(iii), they have not made even a preliminary showing that the as-built bridge will result in any loss of access to Section 4(f) property.  Before the bridge improvement project began, neither cyclists nor pedestrians could cross the Historic Nice Bridge. Now that the new bridge has been built, cyclists may cross the Potomac in shared lanes with additional rider-friendly features.  Although they likely would have had even greater access to 4(f)

---

[5] The fact that the defendants used as their primary comparison point the new design with a separated bike/ped path, rather than the design that was eventually implemented without a separated path, does not undermine the reasonableness of this conclusion.  As noted at the outset of the Re-evaluation, the environmental footprint of the new design with the path is *greater* than without a path.  Thus, a re-assessment was done on a design that would have had an even greater adverse impact on Section 4(f) resources.  In fact, King George County concurred with the finding of *de minimis* impact to Dahlgren Wayside Park, and there was no public opposition to the *de minimis* impact finding.

properties with a separated bike/ped lane, as was promised in the initial design, the decision not to implement that design did not amount to a "restriction on access which substantially diminishes the utility" of surrounding 4(f) properties, which were never accessible to cyclists or pedestrians via a bridge in the first place.  In other words, the fact that the defendants initially offered to provide cyclists and pedestrians with a great deal of access to Section 4(f) properties and then provided cyclists less access (and pedestrians no access) does not amount to a harm to Section 4(f) properties that requires mitigation.[6]

For this reason, the plaintiffs' contention that the separated bike/ped path "was featured as the mitigation basis for Section 4(f)" misses the mark.  There is no indication in the 2012 Final Section 4(f) Evaluation that the bike/ped path was ever intended for that mitigation purpose.  There is a "mitigation measure" in the initial MOA involving the "construct[ion of] a new public trail within Dahlgren Wayside Park that will provide access from the park to the bicycle/pedestrian path on the new bridge."  ECF 9-2, at 43  But this measure provides access from within the park to the new bridge for cyclists and cannot be reasonably interpreted to mean a separate bike/ped path on the bridge was a mitigation measure.  Additionally, this commitment to provide access from the park to the new bridge for cyclists remained in the revised 2018 MOA.  ECF 28-3, at 323. In any event, the Historic Nice Bridge never provided access for cyclists or pedestrians across the Potomac, from Dahlgren Wayside Park or otherwise.  The new bridge will provide greater access for cyclists than they previously had.  And it will do so while taking *less* Section 4(f) property overall than would have been required under the initial bridge design with a separated bike/ped path.  *See* ECF 23-3, at 61.  Absent any violation of Section 4(f), it is not this Court's role to weigh

---

[6] Even though bicycle access was not a need or purpose of the bridge improvement project, the Re-evaluation considered cyclist safety on the new bridge.  *See* ECF 28-3, at 12.

in on what is fundamentally a policy disagreement between the plaintiffs and the defendants about how much Section 4(f) access to provide and in what form.

The plaintiffs have not established a likelihood of success on their Section 4(f) claim.

### 2.   Section 6(f) of the Land and Water Conservation Fund Act

Section 6(f) of the Land and Water Conservation Fund Act requires that "once an area has been funded with L&WCF assistance, it [must be] continually maintained in public recreation use unless [National Park Service] approves substitution property of reasonably equivalent usefulness and location and of at least equal fair market value."   36 C.F.R. § 59.3; 54 U.S.C. § 200305(6)(f)(3).   To subsequently convert recreational use of L&WCF-funded land into a non-recreational use, a state must submit a conversion request to NPS in writing.   36 C.F.R. § 59.3(b). NPS then considers whether the conversion request satisfies certain prerequisites, including that "[a]ll practical alternatives to the proposed conversion have been evaluated."   *Id.*

The plaintiffs identify one area funded with L&WCF assistance: Barnesfield Park.   They allege that NPS never approved the as-built bridge in connection with the use of this Section 6(f) land.   In their reply, they appear to concede that, per the Re-evaluation, the redesigned bridge would be built without taking Section 6(f) property.   ECF 31, at 8.   Indeed, the Re-evaluation states that the "Current Design with Path Option would reduce impacts to Barnesfield Park by 1.31 acres as compared to the FONSI Selected Alternative . . . ."   ECF 28-3, at 37.   Though the new design still involved a "[p]artial acquisition of 0.89 acre of undeveloped woodland," it "avoid[ed] the Section 6(f) area within Parcel A" as shown by a Park Property Impact Map.   *Id.* at 36, 308. Consistent with this analysis, the 2018 Amendment to the MOA reflects that the design had been revised so that the portions of Barnesfield Park to be used "avoid any impact to Parcel A, so that no land acquired for the PROJECT is subject to Section 6(f) of the LWCF Act . . . ."   *Id.* at 319;

*see also id.* at 324 ("The parties acknowledge that, due to a redesign of the PROJECT, compliance with the Land and Water Conservation Act is no longer required").

The plaintiffs argue, however, that the defendants' removal of Section 6(f) considerations from their Re-evaluation and revised MOA "misses the point of Section 6(f), which is to ensure quality and public access to LWCF for future generations." ECF 31, at 8. This argument ignores important facts. The Historic Nice Bridge provided *no* access to Section 6(f) properties, for either cyclists or pedestrians. The new bridge provides more access for cyclists. Moreover, it avoids taking any Section 6(f) property whatsoever, which the plaintiffs' preferred 2012 design would do. As with the plaintiffs' Section 4(f) claims, the Court will not wade into policy disagreements between the plaintiffs and the defendants regarding what access to Section 6(f) properties should look like, so long as it does not appear likely that the defendants have violated Section 6(f) by reducing access from what previously existed.

The plaintiffs have not established a likelihood of success on their Section 6(f) claim.

### 3. National Historic Preservation Act

Section 106 of the National Historic Preservation Act requires that, prior to approving federal funding or issuing licenses, an agency must "take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108. The federal agency must then give the Advisory Council of Historic Preservation ("ACHP") an opportunity to comment on any effects on historic sites. *Id.*; *Waterford Citizens' Ass'n v. Reilly*, 970 F.2d 1287, 1288 (4th Cir. 1992). The NHPA's implementing regulations establish processes by which agencies can consult with the ACHP, state and tribal historic preservation offices, and the public to identify historic properties and evaluate historic significance. 36 C.F.R. § 800.4. The agency then must assess any adverse effects on identified historic properties that would "alter, directly or indirectly, any of the characteristics of

a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." *Id.* § 800.5(a).  The agency is next required to consider alternatives or modifications to avoid, minimize, or mitigate adverse effects. *Id.* § 800.6(a).  A memorandum of agreement "evidences the agency official's compliance with section 106 . . . and shall govern the undertaking and all of its parts." *Id.* § 800.6(c).

All parties agree that demolishing the Historic Nice Bridge unquestionably impacts a historic property within the meaning of Section 106.  Accordingly, the defendants entered into a Section 106 Programmatic Agreement ("PA") with relevant agencies that described mitigation efforts to reduce adverse impacts on the historic site.  *See* ECF 28-3, at 44.  For instance, the PA required the development of a recordation plan to document and photograph the Historic Nice Bridge.  ECF 28-3, at 449.  The defendants included as Attachment J to their Re-evaluation a summary of the status of the mitigation stipulations as of July 31, 2017.  *Id.* at 68.  The summary reports that "[h]istoric photographs and drawings have been obtained and Narrative for Historic American Engineering Record (HAER) will be prepared," with plans to capture more current photographs.  *Id.* at 449.  Mr. Wolfe testified at the hearing that these current photographs had been taken and compiled.

The plaintiffs allege, however, that the separated bike/ped path was intended by the defendants to mitigate the adverse effects on this historic property and that the defendants seek to "remove the bike/ped path without considering the historic impact."  ECF 1, ¶ 209.  Such a contention is not logical.  The plaintiffs fail to explain how providing a separated bike/ped path on a new bridge in any way implicates the historic characteristics of the old bridge, particularly given that the Historic Nice Bridge never allowed pedestrians or cyclists to cross.  Each of the designs

23

under consideration throughout the project's life—the 2012 design, the 2019 design with a separated path, and the current design without a separated path—involved demolishing the Historic Nice Bridge.

To the extent the plaintiffs' claim of "historic harms" is premised on the lack of access to historic trails (specifically, the Potomac Heritage Trail and Dahlgren Heritage Trail), this argument is subject to the same weaknesses as those about access to Section 4(f) and Section 6(f) properties. Mr. Brickley emphasized at the hearing that it is primarily pedestrians who utilize the historic trails but who may not access the trails on foot over the new bridge or on a repurposed old bridge. But pedestrians never had access to the historic trials via the old bridge. Thus, the new bridge's design (coupled with demolition of the old bridge) does not reduce the amount of pedestrian (or cyclist) access, as compared to what they previously had. Whether the focus is the Historic Nice Bridge itself or surrounding historic trials, the plaintiffs are not likely to succeed in showing that the defendants violated their duties under Section 106 by not including a separated bike/ped lane in the as-built bridge or by demolishing the old bridge when no separated bike/ped path exists.

### 4. National Environmental Policy Act

The National Environmental Policy Act is meant "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 184 (4th Cir. 2005) (citing 42 U.S.C. § 4321). To promote such efforts, NEPA places procedural (though not substantive) requirements on federal agencies before undertaking actions, proposals, or projects that may affect the environment. *Hodges v. Abraham*, 300 F.3d 432, 438 (4th Cir. 2002). NEPA requires that "federal agencies must take a 'hard look' at the potential environmental consequences of their actions." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191 (4th Cir. 2009); *see* 42 U.S.C. § 4332.

An "integral underpinning" of NEPA is the requirement that an Environmental Impact Statement ("EIS") "be devised in connection with 'every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment.'" *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 584 (2012) (quoting 42 U.S.C. § 4332(2)(C)). When a project is not likely to have significant effects or the significance of its effects is unknown, federal agencies must draft an Environmental Assessment ("EA"). *See id.*; 40 C.F.R. § 1501.5(a). The EA is designed to determine whether to prepare an EIS or a FONSI. *Id.* (citing 40 C.F.R. § 1508.9(a)(1)). An EIS is not required where there is either no significant impact, or any significant impact would be mitigated (known as a "mitigated FONSI"). *Friends of Back Bay*, 681 F.3d at 587. This review "must be completed 'before decisions are made and before actions are taken.'" *Defenders of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 394 (4th Cir. 2014) (quoting 40 C.F.R. § 1500.1(b)).

The Council on Environmental Quality's NEPA implementation regulations ("CEQ NEPA Regulations") address when a change in circumstances warrants further environmental review. A federal agency must prepare a supplemental environmental impact statement ("SEIS") if the agency "makes substantial changes to the proposed action that are relevant to environmental concerns." 40 U.S.C. § 1502.9(d)(1). If the agency finds that changes to the proposed action relevant to environmental concerns are not significant enough to require a supplement, it "should document that finding consistent with its agency NEPA procedures . . . or, if necessary, in a finding of no significant impact supported by an environmental assessment." *Id.* § 1502.9(d)(4).

The Department of Transportation's NEPA regulations likewise address changes in circumstances. *See* 23 C.F.R. § 771.130. An EIS must be supplemented if the agency determines that "(1) [c]hanges to the proposed action would result in significant environmental impacts that

were not evaluated in the EIS; or (2) [n]ew information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS." *Id.* § 771.130(a).  If the agency is uncertain of the significance of new impacts, the applicant must develop appropriate studies or, if deemed appropriate, an EA. *Id.* § 771.130(c).  The agency then can determine that a supplemental EIS is not necessary, but "must so indicate in the project file." *Id.*  An EA or SEIS "may in some cases be required to address issues of limited scope, such as . . . the evaluation of . . . design variations for a limited portion of the overall project." *Id.* § 771.130(e).  If so, preparation of this supplemental document need not necessarily prevent granting of new approvals, require the withdrawal of previous approvals, or require suspension of project activities not directly affected by the supplement. *Id.*  If the changes are significant enough to require reassessment of more than a limited portion of the overall action, though, any activities that would "have an adverse environmental impact or limit the choice of reasonable alternatives" must be suspended until the supplemental document is completed. *Id.*

"Agencies may not engage in segmentation, which involves an attempt to circumvent NEPA by breaking up one project into smaller projects and not studying the overall impacts of the single overall project." *Defenders of Wildlife*, 762 F.3d at 394 (quoting *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 426 (4th Cir. 2012) (quoting *Coal. On W. Valley Nuclear Wastes v. Chu*, 592 F.3d 306, 311 (2d Cir. 2009))) (internal quotation marks omitted).  Nonetheless, "a tiered or multiphase NEPA analysis may be appropriate for agencies that are 'contemplating large or complex projects.'" *Id.* at 395 (quoting *Shenandoah Valley Network v. Capka*, 669 F.3d 194, 196 (4th Cir. 2012)).  A properly tiered analysis "consists of 'a broad environmental impact statement' followed by 'a subsequent statement or environmental assessment . . . on an action included within'

the program or policy contemplated in the broad statement." *Id.* at 395–96 (quoting 40 C.F.R. § 1502.20).

In assessing NEPA claims, the Court "do[es] not 'second-guess agency decisions, so long as the agency has given a hard look at the environmental impacts of its proposed action.'" *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 221 (4th Cir. 2019) (quoting *Nat'l Audubon Soc'y*, 422 F.3d at 199). "As long as the adverse environmental effects of a proposed action are sufficiently identified and evaluated, an agency is vested with discretion to determine under NEPA that other values outweigh the environmental costs." *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 288 (4th Cir. 1999). NEPA, therefore, "merely prohibits uninformed—rather than unwise—agency action." *Nat'l Audubon Soc'y*, 422 F.3d at 184 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)) (internal quotation marks omitted). The CEQ NEPA regulations further instruct that "minor, non-substantive errors [in complying with NEPA's procedural requirements] that have no effect on agency decision making shall be considered harmless and shall not invalidate an agency action." 40 C.F.R. § 1500.3(d).

The plaintiffs argue the defendants have not complied with NEPA for three reasons. First, the plaintiffs contend that the defendants did not consider the human and environmental impacts of the decision to remove the separated bike/ped path from the new bridge. Second, they assert that the defendants did not consider the impacts of the demolition of the Historic Nice Bridge in sufficient detail, particularly with regard to the use of sub-aqueous explosives. Third, they argue the defendants improperly segmented the NEPA analysis in a way that failed to address the cumulative impact of the project, including both the decision to remove the separated bike/ped path as well as the demolition.

The first argument is not likely to succeed because the plaintiffs have not articulated how the removal of the bike/ped path impacts the areas with which NEPA is concerned in a way that was not addressed in the 2019 Re-evaluation.   The 2019 Re-evaluation conducted a thorough evaluation of the impacts of the current bridge design, including a protected bike path option— that is, the option to have either a protected bike/ped path or shared bicycle lanes.  *See generally* ECF 28-3.  It appears to have comprehensively assessed the environmental impacts of the bridge design changes since the 2012 FONSI.   It summarized the updated engineering data and methodically discussed updated impacts on numerous resources and areas of concern.  It concluded that,

> [i]n comparison to the FONSI Selected Alternative, potential impacts associated with the Current Design with Path Option remain the same for ten resources (land use; residential displacements; business displacements; environmental justice communities; historic properties; archeological sites; open water wetlands; rare, threatened and endangered species; air quality; and Section 4(f) Resources). The Current Design with Path Option has a decrease in impacts to ten resources (institutional displacements; parkland; sites with potential for hazardous materials; streams; floodplains; essential fish habitat; forestland; Maryland Chesapeake Bay Critical Area; Virginia Chesapeake Bay Preservation Area; and Prime Farmland Soils/Soils of Statewide Importance). The Current Design with Path Option has an increase in impacts to four resources (ROW, Tidal Wetlands, Non-tidal Wetlands, and Noise Sensitive Areas).

*Id.* at 34–35.  For the four resources with increases in impacts, it stated that any increase "are minor and will be mitigated in accordance with commitments to regulatory agencies."  *Id.* at 35.  As just one example of the Re-evaluation the defendants undertook, the natural resources section attached a revised Biological Assessment that documented how the design with a path option did not increase adverse impacts on endangered species relative to the original design and described consultations with state and regional wildlife agencies to confirm these assessments.

The plaintiffs have not identified any authority suggesting more is required, and they have not explained how any of the analysis in the Re-evaluation is undermined by the removal of the

bike/ped path.  Indeed, the Re-evaluation itself acknowledges that the inclusion of a bike/ped path created a wider footprint for the project.  The plaintiffs are thus unlikely to prevail in demonstrating that the defendants did not engage in a "hard look" at the environmental impacts of changing the bridge design to its current and final form.  As with the updated Section 4(f) evaluation, it was reasonable for the Re-evaluation to purposefully use "the wider footprint of the Current Design with a barrier-separated bike/pedestrian optional path" in its environmental analysis, rather than the current design without a barrier-separated lane.  *Id.* at 10.  To claim that no re-evaluation took place ignores this fundamental logic.  The plaintiffs' NEPA challenge to the current bridge design is not likely to succeed.[7]

The plaintiffs' second argument—that the defendants have not studied the demolition of the old bridge in sufficient detail—also is not likely to succeed.  While discussion of demolition in the 2012 FONSI and Section 4(f) evaluation was limited, this was so because demolition would not begin for years.  The 2012 FONSI and Section 4(f) evaluation explained that further review would occur later in the process.  That is exactly what happened, and what continues to happen today.  The Re-evaluation considered the impacts of demolition and proposed specific mitigation measures, including the use of skip pans, netting, and anchoring of barges below the deck to catch falling debris; adherence to industry practices regarding lead paint, if necessary; and time-of-year limitations on the dropping and dismantling of trusses and the jetting of piles to protect fish migrations.  It concluded that, as a result of these mitigation measures, no greater impact to the

---

[7] To the extent the plaintiffs argue the defendants needed to consider the impact on cyclist safety resulting from a shared lane design, NEPA likely does not require such review.  "NEPA does not require than an agency take into account every conceivable impact of its actions, including impacts on citizens' subjective experiences."  *Bicycle Trails Council v. Babbitt*, 82 F.3d 1445, 1466–67 (9th Cir. 1996), *as amended* (June 17, 1996) (holding cyclists' concerns of an increased risk of accidents due to trail design was not related to any impact on the physical environment requiring NEPA evaluation).

environment would result than the impact discussed in the 2012 reports.  This is likely sufficient under NEPA and the relevant regulations to allow the defendants to proceed with their current mechanical demolition plans; at the very least, it shows that the defendants have taken a hard look at potential consequences of mechanical demolition on the environment.  *See* 40 U.S.C. § 1502.9(d)(4).

As for the use of sub-aqueous explosives, Mr. Wolfe testified that the approval process is ongoing.  Since January, the MDTA has been consulting with other agencies regarding the use of sub-aqueous explosives, and Mr. Wolfe represented that the agency would seek the necessary permits.  This course of conduct is the supplemental consultation the defendants promised in the revisions to their earlier plans.  The plaintiffs fail to identify any authority supporting their position that this approach is insufficient under NEPA and that the defendants must receive permits for sub-aqueous explosives or prepare a comprehensive demolition plan *before* they may begin non-sub-aqueous demolition at all.  To the contrary, the regulations state that when supplemental review is required "to address an issue of limited scope  . . . the preparation of a supplemental document must not necessarily [] require the suspension of project activities, for any activity not directly affected by the supplement."  23 C.F.R. § 771.130(e)(3).  The use of sub-aqueous explosives is but one potential aspect of the demolition of the Historic Nice Bridge.  It appears sufficiently limited and divorced from the imminent (and fully analyzed and permitted) mechanical demolition activities, including above-water blasting.  As a result, the current absence of permits for sub-aqueous blasting likely does not justify stopping all demolition activities until the review's completion.

Finally, the plaintiffs' third NEPA argument—that the defendants engaged in improper segmentation and have not considered the cumulative impacts of demolishing the old bridge while

not including a separated bike/ped path—is not likely to succeed because, as explained above, the Re-evaluation engaged in a hard look at potential environmental consequences.  Its analysis included the possibility that the new bridge would not include a separated bike/ped path, and it concluded that the greater impacts that would result from the inclusion of a separate bike/ped path did not rise to the level of requiring supplemental environmental documentation.

The plaintiffs have not established their NEPA claims are likely to succeed.

### 5.  Maryland Environmental Policy Act

The Maryland Environmental Policy Act ("MEPA") "provides that all state agencies, with regard to each proposed state action significantly affecting the environment, must prepare what is termed an 'environmental effects report,' which includes, among other things, a discussion of the effects of the proposed state action on the environment." *Pitman v. Wash. Suburban Sanitary Comm'n*, 368 A.2d 473, 475 (Md. 1977).  As the parties acknowledge, there are very few cases interpreting MEPA.  Notably, Maryland courts have never held that there is a private right of action to enforce MEPA's procedural requirements.  The last time the Maryland Court of Appeals addressed the question was in 1977, when it stated: "This Court has not yet decided whether [MEPA] was intended to create any judicially enforceable rights in private parties." *See Mayor of Baltimore v. State*, 378 A.2d 1326, 1332 n.4 (Md. 1977) (citing *Pitman*, 368 A.2d at 476).  The defendants raised this issue, but the plaintiffs did not respond or identify any case suggesting they may bring their MEPA claim.  The Court will not extend Maryland law where the Maryland courts have not done so.

Even if the plaintiffs have a private right of action to enforce MEPA's requirements, the 2012 FONSI and Section 4(f) analysis, the Re-evaluation, and MDTA's years of public outreach and communication, as more fully explained above, are likely sufficient to satisfy the statute's

requirements as to the demolition of the old bridge and the construction of the new bridge without a separated bike/ped path. *See Coll. Gardens Civic Ass'n, Inc. v. U.S. Dep't of Transp.*, 522 F. Supp. 377, 381 (D. Md. 1981) (noting MEPA plaintiffs admitted MEPA was "narrower than its federal counterpart").

### B.   Likelihood of Irreparable Harm

To satisfy the second requirement for preliminary injunctive relief, the plaintiffs "must make a clear showing of irreparable harm[,] . . . and the required irreparable harm must be neither remote nor speculative, but actual and imminent." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002); *Direx Israel*, 952 F.2d at 812 (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)).   The harm also must be more than a mere possibility; it must be likely.  *Winter*, 555 U.S. at 22.  A plaintiff seeking a preliminary injunction "must overcome the presumption that a preliminary injunction will not issue when the harm suffered can be remedied by money damages at the time of judgment." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citing *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994)).  Phrased differently, "the harm must be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'"  *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)).

Certainly, the demolition of a structure such as the Historic Nice Bridge is irreparable.  *See Save the Courthouse Comm. v. Lynn*, 408 F. Supp. 1323, 1343 (S.D.N.Y. 1975) (noting "the act of demolition is irrevocable.  Consideration of alternative plans . . . is permanently foreclosed once [the structures] have been razed" (quoting *Boston Waterfront Residents Ass'n v. Romney*, 343 F. Supp. 89, 91 (D. Mass. 1972))); *Citizens for Rational Coastal Dev. v. U.S. Fed. Hwy. Admin.*, No. CIV.A. 07-4551 (JAP), 2008 WL 2276005, at *3 (D.N.J. May 30, 2008) (finding "irreparable harm

may occur to the existing bridge absent preliminary injunctive relief" because "partial dismantling of certain portions" was scheduled to take place the next day).  But it does not follow that the demolition of the bridge will result in irreparable harm to cyclists and trail-hikers.  They characterize their harm as not having a bridge with a separated bike and pedestrian lane, which they argue is necessary to allow for safe non-motorized passage over the Potomac River.  They argue the Historic Nice Bridge is "the last opportunity to ensure safe crossing at reasonable cost." ECF 9-1, at 6.  But the Historic Nice Bridge safely accommodates only vehicles; cyclists and pedestrians have never been allowed to cross it.  The new bridge, by contrast, allows bicyclists to cross in shared lanes with vehicles.  Pedestrians, still, have no access.  Thus, the demolition of the Historic Nice Bridge either maintains the status quo or improves upon it for the plaintiffs' constituents.  They will not be harmed—let alone irreparably so—by the demolition.[8]

Implicit in the plaintiffs' argument is the notion that additional procedural review under the statutes allegedly violated may force the defendants to keep the old bridge and turn it into a

---

[8] For similar reasons, it is not obvious to the Court that plaintiffs have adequately alleged standing to assert their claims.  To establish standing, a plaintiff must prove that he or she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  An injury in fact is one that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  An organization has standing to bring suit on behalf of members when, among other requirements, the members "would otherwise have standing to sue in their own right . . . ." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000); *see Piedmont Envtl. Council v. U.S. Dep't of Transp.*, 58 Fed. App'x 20, 23 (4th Cir. 2003).  To do so, an organization must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (citation omitted).  The alleged harm here—the demolition of a bridge that possibly could be converted into a dedicated bike/ped crossing—seems too speculative and conjectural to constitute concrete, actual harm.  For reasons stated elsewhere in this opinion, it is highly unlikely—if not impossible—that the old bridge could remain standing now that the new bridge has been built.

bridge for only cyclists and pedestrians.  This argument does not hold water.  "Any inquiry into the irreparable harm resulting from the denial of interim relief must necessarily begin with an analysis of the degree to which that particular relief remedies the alleged injuries." *Faulkner v. Jones*, 10 F.3d 226, 235–36 (4th Cir. 1993).  Procedural violations alone do not constitute irreparable harm.  *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) (holding that there could be no presumption of irreparable harm based on the failure to comply with procedural requirements).  They must be joined with an imminent, concrete injury.  *Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 222 (D.D.C. 2003) (citing *Amoco Prod.*, 480 U.S. at 545).  As the Supreme Court explained in *Amoco Production*, courts considering whether to issue preliminary injunctive relief in cases involving procedural violations should not focus "on the statutory procedure rather than on the underlying substantive policy the process was designed to effect." 480 U.S. at 544.  For NEPA claims in particular, the CEQ NEPA Regulations instruct that "the regulations in this subchapter create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm."  40 C.F.R. § 1500.3(d).

Here, there is a disconnect between the plaintiffs' alleged harm on the one hand—unsafe or unavailable non-motorized passage over a river to historic trails—and the statutory remedies on the other hand—additional procedural reviews intended to minimize harm to Section 4(f) properties, conversion of Section 6(f) properties to other uses, significant environmental impacts, and infringement on historic sites.  Even if the Court were to enjoin the demolition of the bridge to allow the defendants time to cure any alleged procedural deficiencies, the curative measures very likely would not result in the repurposing of the old bridge into one dedicated solely to cyclists

and pedestrians, which is the ultimate relief the plaintiffs seek.[9]  Numerous state and local entities have explored options for retaining the old bridge and concluded that there are no feasible means to do so.  *See* ECF 29-6, ¶ 13; ECF 1-5, at 4; ECF 29-7, at 2–3; ECF 29-8, at 2–5.  The cost of inspecting, repairing, and maintaining the bridge runs to the tune of tens of millions of dollars.  ECF 29-6, ¶¶ 14–15; ECF 1-5, at 2–4.  The grade on the old bridge is steep, rendering it difficult for cyclists and pedestrians to use, and it lacks safety features such as bike-friendly expansion joints and sufficient railing.  ECF 1-5, at 3; ECF 29-8, at 4.  Expensive modifications to the bridge and existing roadways therefore would be necessary to convert the bridge into a usable path.  More importantly, the current record indicates that the two bridges cannot safely coexist.  The piers on the old bridge and new bridge do not align, making it difficult for large watercraft to navigate underneath both bridges.  ECF 29-6, ¶ 18; ECF 29-8, at 2.  In addition, the new bridge was constructed under the assumption that the old bridge would be removed, and problems related to the scouring of the river bottom around the bridge foundations and the scouring mechanisms between the two structures foreclose leaving the old bridge foundations in place.  ECF 1-5, at 4; ECF 29-6, ¶¶ 16–17.[10]  Thus, enjoining the demolition of the Historic Nice Bridge likely would only delay the demolition, not prevent it.

This case is analogous to *Stewart v. Federal Reserve Bank Atlanta, New Orleans Branch*, No. Civ.A. 00-3183, 2000 WL 1681235 (E.D. La. Nov. 7, 2000).  In that case, the Eastern District of Louisiana denied a request for a preliminary injunction that would have prevented the imminent

---

[9] Here, too, the plaintiffs' speculation that the bridge might be repurposed if more studies were conducted raises standing concerns because it suggests their alleged injury might not be redressed by a favorable decision.

[10] The plaintiffs argue that scouring is a long-term problem and that parts of the old bridge will likely stay standing for several years even after demolition begins.  But the present record still indicates that the two bridges likely cannot coexist in perpetuity.

demolition of an old building. *Id.* at *3. The plaintiff claimed that the agency defendant was required by the NHPA to wait 30 days after obtaining an opinion on historic value from the Secretary of the Interior (the "Keeper"). *Id.* at *1. The Keeper had determined the building in question was not protected, and the plaintiff planned to ask him to change his mind. *Id.* at *2. The agency wanted to proceed immediately. *Id.* The court observed that, even if the Keeper concluded the building did have historic value, the agency "still had the ultimate authority to decide that demolition was necessary" because the NHPA permits an agency to "adopt any course of action it believed appropriate" after considering the Keeper's decision. *Id.* The court held that the plaintiff had not demonstrated a likelihood of irreparable injury because he had not shown that "a delay of thirty days would in any way alter Defendant's determination to destroy the building." *Id.* at *3. It reasoned that "noncompliance with the requirements of a procedural statute alone will not necessarily mandate the issuance of a preliminary injunction when the ultimate outcome will be the same, and important policy objectives—such as public participation—will not be undermined." *Id.* (citing *Amoco Prod. Co.*, 480 U.S. at 544).

The new bridge will open to the public in two days, and on the record before the Court, the two bridges likely cannot safely coexist. So, enjoining the demolition of the old bridge to allow additional time for procedural reviews and consideration of repurposing the old bridge will not prevent irreparable harm to the plaintiffs. *See Stewart*, 2000 WL 1681235 at *2–3; *Bethel Ministries, Inc. v. Salmon*, No. SAG-19-01853, 2020 WL 292055, at *6 (D. Md. Jan. 21, 2020) (finding no irreparable harm where the plaintiff had "not made a clear showing that a preliminary injunction would remedy its alleged irreparable harm"). In such circumstances, a preliminary injunction is not warranted. *See Citizens for Rational Costal Dev.*, 2008 WL 2276005, at *6 (denying preliminary injunction that would have enjoined an ongoing bridge-replacement project

based on procedural deficiencies where "there remain[ed] a possibility that further [] evaluation could indicate no prudent and feasible alternative to bridge replacement exists, and that the project should proceed exactly as presently planned").

### C.     Balance of the Equities and the Public Interest

The Court considers the last two factors in tandem because "the balance of the equities and the public interest . . . 'merge when the Government is the opposing party.'" *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 242 (D. Md. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  As to the balance of the equities, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co.*, 480 U.S. at 542).   When considering the public interest, the Court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

The plaintiffs argue the balance of the equities favors them because nothing requires the defendants to proceed immediately with the demolition of the old bridge, whereas demolition will permanently foreclose any use of the old bridge as a bike and pedestrian path.  The Court disagrees and concludes the balance of the equities and the public interest counsel against a preliminary injunction.

The plaintiffs' delay in seeking injunctive relief undermines their claims of irreparable injury.  Even if "a particular period of delay may not rise to the level of laches . . . it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction." *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)); *see also Benisek v. Lamone*, 138 S.

Ct. 1942, 1944 (2018) (analyzing the balance of the equities and stating "a party requesting a preliminary injunction must generally show reasonable diligence"); *Lydo Enters. v. Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (finding grant of preliminary injunction to be an abuse of discretion because the plaintiff waited four months after notification of adverse zoning decision before bringing suit).  In *Quince Orchard*, the Fourth Circuit upheld the denial of a request for a preliminary injunction when the plaintiffs had waited nine months before seeking injunctive relief. *Id.*  The plaintiffs wanted to enjoin the construction of a road through a state park, and they argued the defendants had failed to comply with procedural requirements. *Id.* at 75.  Central to the Fourth Circuit's decision was "the time sensitive nature of the project involved, and [] the fact that more expeditious action by the plaintiffs would have avoided major disruptions and increased costs." *Candle Factory, Inc. v. Trade Assocs. Grp., Ltd.*, 23 F. App'x 134, 137–38 (4th Cir. 2001) (unpublished per curiam) (discussing *Quince Orchard*).

Other courts have reached similar conclusions in cases like this one.  For example, in *Business & Residents Alliance of East Harlem v. Martinez*, No. 03 Civ.5363 (JFK), 2003 WL 21982960 (S.D.N.Y. 2003), the U.S. District Court for the Southern District of New York rejected a request for a preliminary injunction to enjoin the demolition of vacant factory buildings because the plaintiffs had delayed filing suit.  The court reasoned that "[c]onsiderable delay in filing an action seeking injunctive relief weighs against finding irreparable harm present." *Id.* at *2 (citing *Wallikas v. Harder*, 78 F. Supp. 2d 36, 41–42 (N.D.N.Y. 1999)).  The first demolition permit for the building was approved in 1999.  Actual demolition began in March 2003.  The plaintiff did not file until July 2003.  The court held the plaintiffs' "delay in filing this action undermines the sense of urgency and irreparable harm normally attendant to a building facing a wrecking ball[,]" and their "failure to bring legal action until this late date undermines the urgency required to prevail

here." *Id.*  It concluded "any irreparable harm resulting from permitting the completion of the demolition is negated by the delay in bringing this action." *Id.*  Likewise, in *Mooreforce, Inc. v. U.S. Department of Transportation*, 243 F. Supp. 2d 425 (M.D.N.C. 2003), the U.S. District Court for the Middle District of North Carolina held that plaintiffs' delay in filing to enjoin the construction of a highway bypass rendered "any irreparable harm [they] could face . . . a consequence of 'their own procrastination.'" *Id.* at 535 (quoting *Quince Orchard*, 872 F.2d at 79). In that case, the plaintiffs waited years "until the last possible moment before they requested intervention from the Court" to enforce the environmental review process.  *Id.*

The reasoning in these cases applies equally to the facts here.  The demolition of the Historic Nice Bridge was announced in October 2012 as part of the bridge improvement plan option selected by the MDTA.  The possibility that the new bridge might not include a separated bike/ped lane was communicated to the public in July 2019.  The decision to not include a separated bike/ped lane was publicly announced in December 2019.  MTA announced in May 2022 that demolition plans were underway and in July 2022 communicated to Senators Cardin and Van Hollen and Congressman Hoyer that demolition was imminent.

During the hearing, the plaintiffs offered several explanations for their delay.  First, Mr. Brickley testified that according to the MDTA website, demolition was not slated to begin until 2023.  Based on this representation, the plaintiffs thought they had time to garner political support (including after the upcoming gubernatorial elections) for halting demolition and repurposing the old bridge.  In response, Mr. Wolfe explained that the demolition plan had been accelerated but did not indicate that the MDTA website had been updated.  Second, Mr. Brickley testified that Jim Ports (Chairman of MDTA) stated in a public meeting with the Transportation Planning Board that he was willing to engage again with the community, specifically the Consolidated Transportation

Program, about the bridge in the fall.  *See* ECF 31-1, at 7 ("And we're going out, CTP starts September 15th and goes until November 15th by law . . . We would be more than happy to listen to them again.").  Again, based on this, the plaintiffs thought they had more time to seek political redress.

The plaintiffs may well have had good reason to rely on these representations.  But a desire to pursue political avenues does not excuse a years- or even months-long delay in seeking judicial intervention.  *See Citizens for the Scenic Severn River Bridge, Inc. v. Skinner*, 802 F. Supp. 1325, 1342 (D. Md. 1991), *aff'd*, *Citizens for Scenic Severn River Bridge, Inc. v. Skinner*, 192 F.2d 338 (4th Cir. 1992) (Table) (finding laches barred plaintiffs from pursuing preliminary injunction on Section 4(f), NHPA, and NEPA claims where plaintiffs' explanation for delay in filing was "political efforts . . . to stop construction.")  *Citizens for the Scenic Severn River Bridge, Inc.* is instructive.  *Id.*  There, the plaintiffs filed suit in September 1991 to enjoin the state from replacing an old bridge with a new bridge of a certain height.  *Id.*  Through diligence, the plaintiffs should have been aware of the commitment to a high bridge as far back as 1985; by spring 1990, "there should have been no doubt about what the Defendants intended to build."  *Id.*  Even if the cause of action accrued when federal funding was received in December 1990, as the plaintiffs urged, the court found that their delay until "the eve of awarding of the construction contract" had caused the defendants considerable prejudice.  *Id.*  The court concluded that "[a] delay at the contract stage or after is obviously far more expensive than a delay earlier in the process.  Under such circumstances, the prejudice to Defendants is substantial."  *Id.*

Here, the defendants are far past the contract stage.  Demolition crews are mobilized on site, and demolition is scheduled to begin in a few days.  The plaintiffs knew as early as December 2019—21 months ago—that the new bridge would not have a dedicated bike/ped lane and that the

plan to demolish the Historic Nice Bridge remained.  They were aware that federal funding (the TIFIA loan) was granted by April 2022.  ECF 1, at 20 n.3.  Their desire to resolve the conflict through political means, while admirable and less expensive, does not excuse the fact that they knew from the start that the defendants intended to demolish the old bridge.  As a result, the plaintiffs' significant delay in seeking judicial intervention reduces the weight the Court might afford to their claim of irreparable harm.

On the other side of the scales, significant harm to the defendants and the public would result from a delay in demolishing the old bridge.  Delays in the current demolition timeline, which is far past the contracting stage, likely would expose the State of Maryland to thousands of dollars per day in delay costs under the contract.  A years-long delay has the potential to increase costs exponentially due to the continued contractor penalty fees and the costs of maintaining the old bridge.  Mr. Wolfe testified that the demolition crew already has removed one of the fender units around the bridge's main piers that had deteriorated and fallen into the river.  This motivated MDTA and its contractor to inspect the remaining fender units.  As a result of the inspection, other fender units were removed.  The earlier-than-expected beginning of the demolition process, which required the contractor to set up equipment on site, kickstarted the current demolition timeline. The demolition crew is on-site and is ready to begin mechanical demolition on Thursday.  Other cases considering whether to pause in-progress demolition have declined to do so, citing the inherent safety risks.  In *Citizens for Rational Coastal Development*, for example, the plaintiffs challenged the in-progress demolition of a bridge under § 4(f).  2008 WL 2276005, at *1.  The district court found that "[d]ue to the continuing deterioration of the existing bridge, any delay in the project only increases the likelihood of hazards to the public."  *Id.* at *6.  In language that mirrors the issues now pending, the court stated "[a]n injunction halting, even temporarily, a

project to replace a 75-year old bridge at the end of its service life, that is in a state of disrepair and which continues to deteriorate, and that is a key link in a major coastal evacuation route, presents serious public safety concerns."   *Id.* at *7.   Further, while "safety concerns [we]re paramount," the court also noted "that a delay would result in a substantial escalation of the costs of the project, on which substantial public funds have already been expended."   *Id.* at *6.   The court concluded the risk to public safety and the ballooning costs of delays outweighed the plaintiffs' interest in ensuring the proper procedures were followed.   *Id.*   The harm to the defendants and the public that will result from enjoining the demolition in this case is analogous.

Balancing the hardships and the equities in this case, the Court concludes the balance tips in the defendants' favor and against preliminary injunctive relief.   Consideration of the public interest also counsels against an injunction.

—————————————

Preliminary injunctions are about preserving the status quo.   The status quo today is that a new bridge has been built and is about to open; demolition of the old bridge has been contemplated for years; repurposing the old bridge into a dedicated bike/ped crossing has been considered and rejected by various governmental agencies; the new bridge was constructed based on the assumption that the old bridge would be demolished; and keeping the old bridge renders the new bridge unsafe.   The Court will not speculate whether a lawsuit filed months or years ago would have saved the Historic Nice Bridge.   But today, on the eve of the bridge's demolition, the plaintiffs have not satisfied the high bar for the extraordinary injunctive relief they seek.   At the heart of their claims is their understandable disagreement with the state defendants' decision not to allocate public funds for a separated lane for cyclists and pedestrians to cross the Potomac River from

Maryland to Virginia.  That was a policy decision, made years ago and beyond the purview of this Court.

**IV.     Conclusion**

The plaintiffs' motion for a preliminary injunction is denied, and their motion for a temporary restraining order is denied as moot.

October 11, 2022

_____
Deborah L. Boardman
United States District Judge

43